JEFFERSON ELECTRIC CO. v. NATION-
AL LABOR RELATIONS BOARD et al.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS v. NATIONAL
LABOR RELATIONS BOARD.

No. 6726.

Circuit Court of Appeals, Seventh Circuit.
March 31, 1939.

M. S. McDonough, of Iron River, Mich., Earl W. Le Fever, of Cleveland, Ohio, and Otto A. Jaburek, of Chicago, Ill., for Jefferson Electric Co.

Joseph A. Padway, of Milwaukee, Wis., for International Brotherhood.

G. L. Patterson, of Washington, D. C., for National Labor Relations Board.

Charles Fahy and Robert B. Watts, all of Washington, D. C., for other respondents.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This case is here on separate petitions by the Jefferson Electric Company (hereinafter also referred to as the "employer", "Jefferson Electric", "petitioner", or "company") and the International Brotherhood of Electrical Workers (hereinafter also referred to as the "Brotherhood" or "intervenor") to review and set aside, and on request by the National Labor Relations Board for the enforcement of, an order of the National Labor Relations Board (hereinafter also referred to as the "Board"). Sec. 10(e, f), National Labor Relations Act, Title 29, U.S.C.A. § 160(e), (f), ch. 372, 49 Stat. 453.

The case arose out of the opposing unionization campaigns conducted by the United Electrical and Radio Workers of America, a labor organization (hereinafter also referred to as the "United") affiliated with the Committee for Industrial Organization, and the Brotherhood, a labor organization affiliated with the American Federation of Labor, to represent the employees of the Bellwood, Illinois plant of the Jefferson Electric Company.

Jefferson Electric perfected closed-shop contracts with the Brotherhood, and United filed charges of unfair labor practices with the Board. Secs. 8(1, 3), 10(b), N.L.R.A., Title 29, U.S.C.A. §§ 158(1, 3), 160(b), ch. 372, 49 Stat. 452, 453. After a hearing, the Board concluded that the closed-shop contracts were in effect the culmination of the employer's unfair labor practices, and ordered the Jefferson Electric Company to reinstate with back pay certain employees, to cease conduct which interfered with the employees' right to select an exclusive bargaining representative of their own choice, to cease its partisanship in favor of the Brotherhood, and to post notices that the closed-shop contracts were invalid. It is this order [1] of the Board which is the subject of judicial review. The facts follow:

---

[1] The Board's Order follows verbatim:

"Upon the basis of the above findings of fact and conclusions of law and pursuant to Section 10(c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Jefferson Electric Company and its officers, agents, successors and assigns shall:

"1. Cease and desist from:

"(a) Discouraging membership in United Electrical and Radio Workers of America or any other labor organization of its employees by discriminating in regard to hire or tenure of employment or any term or condition of employment;

"(b) Encouraging membership in International Brotherhood of Electrical Workers or any other labor organization of its employees by discriminating in regard to hire or tenure of employment or any term or condition of employment;

"(c) Recognizing International Brotherhood of Electrical Workers as the exclusive bargaining representative of its employees unless and until International Brotherhood of Electrical Workers is certified as such by the Board;

"(d) Giving effect to its contracts of May 17 and June 29, 1937, with International Brotherhood of Electrical Workers;

"(e) In any other manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Offer to Alfred Wittersheim, Edward J. Phelan, and Nikols Franzen immediate and full reinstatement to their former positions without prejudice to their seniority and other rights or privileges;

"(b) Make whole Alfred Wittersheim, Edward J. Phelan, and Nikols Franzen for any loss of pay they have suffered by reason of their discharges, by payment to each of them of a sum equal to that which he would normally have earned as wages during the period from the date of his discharge to the date of such offer of reinstatement, less any amount earned by him during such period;

"(c) Post immediately notices to its employees in conspicuous places through its plant at Bellwood, Illinois, and maintain such notices for a period of at least thirty (30) consecutive days, stating: (1) that the respondent will cease and desist in the manner aforesaid; (2) that in order to secure or continue his employment in

Prior to 1937 no attempts had ever been made to unionize the plant. Then, sometime in January of 1937, J. M. Marquis (business agent of the Brotherhood) made his first appearance before the company in his organizational campaign. Before this time the only effort to band together had produced the Jefferson Social Club, which provided recreational facilities for the employees and foremen of the company. Upon this first visit to the company plant Marquis spoke to Enos A. Hamer (President of the Jefferson Social Club) and asked him, without success, for a list of the company's employees. Early in February Marquis met Luke Gallagher, a popular employee, who, when informed of Marquis' mission, stated that the employees had been treated very nicely by the company. After describing the advantages which the employees were enjoying and the manner in which the company had treated them over a period of years, Gallagher expressed the thought that it would be a difficult proposition to induce the men to join the Brotherhood, but stated that he would be willing to assist, whereupon Gallagher gave Marquis the names of some of the employees.

On April 28 Marquis informed James C. Daley (Vice President of the company) that the Brotherhood represented 240 employees. After assuring Marquis that the company was neither opposed nor partial to unionism, Daley informed him that there were 900 employees in the plant and suggested (upon request) the name of Hamer as a person who might help him. Marquis thereafter continued his organization work, and, on May 10, claimed he had 600 pledges or members in his organization. On May 11, by telephone, he informed Daley of that fact and requested permission to bring a sound truck into the company's yard so as to induce the remaining employees to join the Brotherhood. Permission was granted on May 12, the normal lunch period was extended thirty minutes, and the employees were addressed by Brotherhood organizers and employee Harry Rudnick. During the addresses, which were not derogatory to the company or to the United, the gates were locked and the yard was guarded by a company foreman and a city policeman. After the sound-truck meeting a committee

of employees requested Marquis to meet it in the cafeteria, where they remained for thirty minutes. Marquis' next visit to the plant was on May 18, at which time he established headquarters in the cafeteria. In addition he was given a visitor's badge and was permitted to solicit membership in the Brotherhood.

In April the United also commenced an organization campaign among the employees. This was brought to the attention of the company about May 1, 1937. At no time did the United request the use of the company's premises for meeting purposes, although during the first two weeks of May its organizers were actively engaged near the plant in distributing membership applications among the employees of the company and in circulating hand-bills urging them to join the United.

On May 10 a number of the company's employees called upon Daley and inquired whether they could not organize a union of their own. Daley informed them that they had a right to organize, but added that the company was assuming a hands-off or neutral policy. Thereupon, during working hours, four employees circulated a petition in the plant, urging the organization of an independent union. This petition was posted on the company's bulletin board; the plant was closed at 2:30 p. m., so as to enable all of the employees to attend a meeting at the Social Club, where the merits of having an independent union were discussed; and a similar meeting was held on May 11 in the cafeteria. These efforts to form an independent union failed. On the afternoon of May 11 some of these men attended a meeting in the company's Board of Directors' room, where Hamer, at Daley's suggestion, introduced Marquis, who addressed them in behalf of the Brotherhood. After Hamer introduced Marquis, he left the room and did not remain for the meeting.

Although testimony by United witnesses suggested solicitation of the employees during working hours, the exact date was not revealed. Henry Kasper, witness for petitioner, was not sure as to the time of solicitation, and gave two possible periods of time, i. e., before or after May 15. J.

the plant, a person need not become or remain a member of International Brotherhood of Electrical Workers; and (3) that the respondent's contracts with the International Brotherhood of Electrical Workers, dated May 17 and June 29,

1937, are void and of no effect;

"(d) Notify the Regional Director for the Thirteenth Region in writing within ten (10) days from the date of this order what steps the respondent has taken to comply therewith."

M. Marquis, on the other hand, was positive that the solicitation did not occur until after May 17. In addition he testified that on May 11 the Brotherhood had unionized 600 of the employees, which is in excess of the 483 that constituted a majority. Later, on May 15, Marquis submitted to Daley the notarial certificate, which certified that on that date notary public Sloan had counted 703 union application cards signed by employees of Jefferson Electric designating the Brotherhood as their representative.

According to Jefferson Electric, its conduct was consistent with the company's neutral position. According to Marquis, the Brotherhood claimed to represent 240 employees on April 28 and 600 on May 11, whereas 483 constituted a majority.

On May 17, 1937 Jefferson Electric met with the Brotherhood, recognized that organization as the exclusive bargaining agent for the employees, and executed with it a short form closed-shop agreement. By the terms of the contract the parties agreed to meet again within ten days to negotiate a more complete contract. Accordingly, meetings ensued, and a proposed further agreement was drafted. The terms of this agreement were then submitted to the Brotherhood membership for ratification. It was ratified by postcard ballot, and on June 29 the agreement was formally executed, effective as of May 17, 1937.

On May 20, 1937 the United organizers, John M. Smith and Earl T. McGrew, called on John A. Bennan (president of Jefferson Electric). They requested Jefferson Electric to meet a United committee on the matter of collective bargaining for its members. They also inquired as to the truth of the rumor that Jefferson Electric had completed a closed-shop agreement with the Brotherhood on May 17. Bennan, who had been out of the city from April 25 to May 20 and had not been informed as to what had transpired during his absence, referred them to Daley, who had full charge of the plant.

On May 21 the United filed with the Board a petition urging an investigation of the representation of the employees of Jefferson Electric. Sec. 9(c), N.L.R.A., Title 29, U.S.C.A. § 159(c). A hearing was set for July 7 and later postponed to July 26. In the meantime, charges of unfair labor practices by the company had been filed with the Board by the United. In the end the "9-c" hearing was not held and the "9-c" petition was withdrawn.

After the signing of the closed-shop agreement on May 17, Jefferson Electric discharged three men; namely, Edward Phelan and Nicholas Franzen on June 11, and Alfred Wittersheim on June 18. The company stated that the discharges were nondiscriminatory and wholly unrelated to the closed-shop agreement. On the other hand, Phelan, Franzen and Wittersheim insisted that they were discharged because of their activities in behalf of the United.

On October 15, 1937, after charges of unfair labor practices had been filed on behalf of United, the Board issued its complaint against the employer. Sec. 10(b), N.L.R.A., Title 29, U.S.C.A. § 160(B). The complaint, as thereafter amended, ·alleged inter alia that the employer had discharged certain employees because of their union activities; that the employer, through its officers and supervisory employees had encouraged its employees to join the Brotherhood and had discouraged them from joining or retaining membership in the United by threatening them with discharge for failure to join the Brotherhood; and that the employer's unfair labor practices finally culminated in the closed-shop contracts at a time when the Brotherhood was not the free choice of a majority of the employees. Notice of the hearing was given on October 15 and the hearing was held from October 21 through October 26. On October 22 the complaint was amended by the addition of the closed-shop contracts allegation, and the Brotherhood's motion to intervene in the proceeding was granted. After all the evidence bearing on the issues had been introduced, the hearing was terminated on October 26 and the Trial Examiner rendered his Intermediate Report on December 23. During the first week in January of 1938 the employer and the Brotherhood filed exceptions to this Report and requested oral argument before the Board. On February 10 a hearing was conducted before the Board in Washington, D. C., in which the employer, the Brotherhood, and the United participated.

■ This tripartite controversy[2] presents a bitter contest between the American

---

[2] That the controversy clearly comes within the jurisdiction of the Board is not questioned by counsel on either side. Petitioner is an Illinois corporation pro- ducing, selling, and distributing various electrical supplies. Approximately 75% of its raw materials come from extra- state sources and about 90% of its finish-

Federation of Labor and the Committee for Industrial Organization, each labor organization seeking recognition as the sole and exclusive bargaining representative of the same group of employees. We take judicial notice that the recent past has brought a distinct cleavage in the American labor movement, dividing labor into warring factions and leaving in its wake unnecessary unrest and strife.[3]

We also realize that the Board is injected into a distasteful position, in that either horn of the dilemma chosen is bound to result in charges of favoritism by the opposing side. Our task of judicial review in this case requires us to see that the Board's findings are supported by substantial evidence and that the Board's procedure is consistent with due process of law.

Petitioner and intervenor have raised several points as to the lack of procedural due process of law. Petitioner contends that the validity of the closed-shop contracts was not in issue and that in any event it had no opportunity to meet this issue. The Brotherhood claims that it was not given a chance to prepare its case and that the exclusion of certain evidence was unreasonable and arbitrary.

█ That the procedural action of the Board must conform to standards of fairness and reasonableness is fundamental. That there must be due notice of, and an opportunity to be heard on, all points properly in issue is clear. The judiciary is vigilant that the administrative justice of boards and commissions adhere strictly to the principle of fair play. The fear of counsel for petitioner, expressed by way of reminder to Hewart's "The New Despotism," is groundless, as long as courts sit. Administrative justice is consistent, not incompatible, with our Supremacy of the Law.

█ We fail to appreciate the contention that the validity of the contracts was not in issue. As soon as the complaint was amended, on the second day of the hearing, so as to allege that the contracts were the culmination of petitioner's unfair labor practices from May 12 through May 17, the contracts were in issue. The Brotherhood intervened, and both the intervenor and petitioner had notice of this amendment. In fact, petitioner thereupon amended its answer so that it alleged that the Brotherhood represented a majority of the employees at the time of the execution of the contracts. Then the validity of the contracts as an issue in the case was actually litigated. Evidence to sustain the charge was introduced by the Board; proof to refute the charge was submitted by petitioner and intervenor. Later, the Board's complaint was further amended to meet petitioner's answer, so as to allege that at the time of the contract the Brotherhood did not represent a majority of the employees. This latter amendment merely corrected the pleading to conform with the evidence already in. These amending rulings of the Trial Examiner were discretionary and afforded no basis for challenging the validity of the hearing.

█ During the hearing the Trial Examiner refused to admit in evidence certain United circulars, which were offered to show the attitude of the United union to the employer. All facts tending to prove or disprove a violation of the Act constitute relevant evidence. It is true that in this case similar evidence had been received. For this reason it would have been better for the Trial Examiner to have accepted the evidence, although the evidence was irrelevant. Since this isolated exclusion was not prejudicial to petitioner and intervenor, however, we can not attach to it the significance that the Brotherhood does. Intervenor's counsel also contends that this instance of excluded evidence and the questioning by the Trial Examiner of witnesses for petitioner and intervenor indicate an unfair and biased conduct of the hearing. We have carefully studied the record, which to us reveals that the Trial Examiner was fair in his behavior toward the parties in this tripartite controversy. Where the testimony given is controversial, there is no prejudice in the Examiner's examination of the key witnesses. That some of the evidence elicited in this manner was not favor-

ed products are shipped to purchasers outside of Illinois. Its annual sales range from $4,000,000 to $6,000,000.

[3] See vol. 14, Fortune, p. 89, October (1936) for the history of the development of the C. I. O.-A. F. L. controversy; also see New York Times, Sept. 19, 1937,

Sec. IV, at p. 7. See also Time Magazine, p. 16, on October 4, 1937: "Today he (William Green) is looking for new friends, openly bidding for employer support in the war with C. I. O., and getting it—to an extent that makes C. I. O. howl that A. F. of L. is chartering company unions."

able to the intervenor does not necessarily indicate bias on the part of the Examiner.

It is difficult for us to understand the contention that no opportunity was given to meet the issue as to the contracts. As far as petitioner is concerned, the amendment on October 22 neither surprised nor imposed a much greater task of submitting proof. The amendment added that the contracts were the last step in the employer's plan to herd the employees into the Brotherhood, the original complaint having already alleged as to the employer's plan. As far as the intervenor is concerned, counsel admitted that attendance at the hearing from the start was prompted by the anticipation that the validity of the contracts would be brought in as an issue, whereupon it would be his purpose to intervene. Intervenor claims it was prejudiced, when the Trial Examiner refused to grant a continuance, on the ground that a continuance would have given the Brotherhood sufficient time to prepare its evidence on the majority status, so that no discrepancy would have occurred between the notarial cards and the notarial count. It is elementary law that the matter of continuances rests in the sound discretion of the Trial Examiner and his ruling in that regard is not ordinarily reviewable. We see no reason for applying an exception in this case. Admittedly, the contracts issue was not a surprise to the Brotherhood. Furthermore, at the close of the evidence, there was no request made that additional evidence be taken. In addition, neither petitioner nor intervenor saw fit to apply to this court for leave to adduce additional evidence. 29 U.S.C.A., § 160(e), (f). After the hearing, on December 23, the Trial Examiner rendered his intermediate report to the Board. Petitioner and intervenor filed exceptions thereto and requested an oral argument. On February 10, 1938, a hearing was conducted before the Board in Washington.

We find no basis for the conclusion that the issues were not properly defined, that petitioner and intervenor were not fully advised as to these issues, and that they were not given sufficient time to meet the issues. Therefore, we can not sustain the points raised as to the lack of procedural due process of law.

The main issue before the Board involves the question whether the closed-shop contracts were intended to effect illegal labor practices. That is, the real issue is whether there is substantial evidence to support the Board's finding that Jefferson Electric committed the unfair labor practice of fostering the Brotherhood and of dealing exclusively with that union while its numerical strength remained in doubt. If the evidence justifies this finding, it is clear that Jefferson Electric has violated Sections 158(1), (3), 29 U.S.C.A. Thus, section "8(1)" would be violated because there is an interference with the worker's free choice to select his bargaining agent, and "8(3)" would be violated because membership in the Brotherhood is encouraged and membership in the United is discouraged, thereby discriminating in regard to conditions of employment. Such action on the part of Jefferson Electric would make inoperative the "8(3)" proviso, which sanctions closed-shop contracts, since the proviso's two conditions are absent, i. e., an uncoerced and nonassisted majority.

The attitude of the courts as to the evidence before the Board has been amply expressed in the past. The Circuit Court of Appeals for the Fifth Circuit has said: "The evidence to support a finding of the Board should furnish a reasonably sound basis from which the facts in issue may fairly be inferred. A good rule for weighing the evidence to ascertain whether it is adequate for the purpose mentioned is to compare it with the evidence necesssary to sustain the verdict of a jury upon a similar issue. Such evidence must be substantial." National Labor Relations Board v. Bell Oil & Gas Co., 98 F.2d 405, at page 410.

The United States Supreme Court has also spoken: "We agree that the statute (the National Labor Relations Act), in providing that 'the findings of the Board as to the facts, if supported by evidence, shall be conclusive', section 10(e), 29 U.S.C.A. § 160(e), means supported by substantial evidence. * * * Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. et al. v. National Labor Relations Board et al., 305 U.S. 197, 59 S.Ct. 206, 216, 83 L.Ed. ——.

See, also, National Labor Relations Board v. Columbian Enameling & Stamping Company, Inc., 59 S.Ct. 501, 83 L.Ed. ——, decided by the United States Supreme Court Feb. 27, 1939.

Summing up, it may be said that it is a question of law as to whether there is competent evidence to support the Board's findings of fact, and that it is a question of

fact as to whether the competent evidence is sufficient. In balancing controversial testimony, therefore, the courts have recognized that it is the Board's province to find the facts "not alone as the direct testimony declares them to be, but as the background, setting, and circumstances under which that testimony was given and the matters testified about transpired, including the interests and motives of those testifying, give color and meaning to the testimony." Agwilines, Inc., v. National Labor Relations Board, 5 Cir., 87 F.2d 146, at page 151.

We have minutely scrutinized the evidence to ascertain if the findings are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and, being mindful that we are not bound to accept findings based on evidence which merely create a suspicion or give rise to an inference that cannot reasonably be accepted, Ballston-Stillwater Knitting Co., Inc., v. National Labor Relations Board, 2 Cir., 98 F.2d 758, we have reached the conclusion that the Board's findings as to section 8(1) and (3) lack the support of substantial evidence.

In the instant case there were no threats so as to intimidate the employees into joining a particular labor organization against their will, and there is no evidence in the record which would warrant a finding that the conduct of the company was indicative of coercion or intimidation. To us it is clear that the company had come to a realization that its plant was about to be unionized. It had for many years maintained friendly relations with its employees and desired that such relations continue. It was in this spirit that it allowed the use of the cafeteria and other plant privileges. Such acts, standing alone, are not inconsistent with a strict "hands-off" policy. It was never the intention of Congress to prohibit friendly intercourse between employers and labor organizations, to curtail freedom of speech, to deprive an employer of his right to express an honest opinion or to outlaw the extension of common courtesies. It is more in keeping with the purpose of the Act to foster such friendship rather than to condemn it. The language of the court, in National Labor Relations Board v. Union Pacific Stages, 9 Cir., 99 F.2d 153, 178, seems to be pertinent:

"Expressions of opinion by three of respondent's local superintendents, Goodland, Gormley and Kuse, which are more or less critical of unions, as testified to by the president of the Union, some of the discharged drivers and others, are cited by the Board as proof of a consistently hostile attitude toward the Union on the part of the respondent. In the main these statements attributed to these officials were denied by them. Respondent earnestly insists that such expressions, even if made, were of individual opinions and did not represent the attitude of the respondent, which it is urged was stated by President Walsh before the organization was formed, to the effect that, 'If the boys wanted a union they could have it.' * * *

"It is difficult to think that Congress intended to forbid an employer from expressing a general opinion that an employee would find it more to his advantage not to belong to a union. Had Congress attempted so to do it would be in violation of the First Amendment, U.S.C.A.Const. Amend. 1. The right of workers to organize freely must be conceded. It is a natural right of equal rank with the great right of free speech, protected by the Constitution. But the right of the workers to organize is not destroyed by expressions of opinion of the employer or employee, such as referred to above. The case is different where the employer makes use of threats to prevent organization. In the instant case, while the executives expressed themselves as wholly agreeable to the formation of the Union there are some statements attributed to local superintendents evidencing a threatening attitude, testified to by the Union witnesses but denied by these officials. In any event, as to this there appears to be some conflict in the evidence."

Viewing the record as a whole, it is difficult for us to point out evidence acceptable by the reasonable mind as adequate to support the conclusion that prior to May 17 the company had undertaken any affirmative action, which could be construed as conduct preventing unionization, discouraging employee affiliation with the United, or encouraging employees to become members of the Brotherhood. On the contrary the record discloses that petitioner maintained an attitude of neutrality respecting all organizational activity among its employees. The most that can be made out of the record is that petitioner was showing a preference toward the Brotherhood but extended acts of cooperation toward both unions.

But while it is true that employer leadership through supervisory employees is condemned by the Act, and that pressure

overriding the will of the employees, as a means of encouraging or discouraging membership in any labor organization, constitutes interference with a worker's right to select his representative, it does not follow that the mere showing of a preference and acts of cooperation constitute interference with an employee in his exercise of the rights guaranteed under the Act.

 We now approach the closed-shop contracts. The Board found that, at the time the contracts were made, the Brotherhood did not represent a majority of the employees. Jefferson Electric and the Brotherhood contend that the Brotherhood did represent a majority and argue that the closed-shop agreement was justified under the "8(3)" proviso, which sanctions such an agreement if the union represents the majority of the employees. Marquis testified that the Brotherhood had signed up 600 employees by May 11, which was a clear majority. The Board offered no evidence tending to disprove the Brotherhood's majority. Moreover, the Board admitted that the cards indicated a possibility of a majority on May 17, and an examination of these cards showed that after discarding defective and duplicate cards the Brotherhood still had 543 members, whereas 483 constituted a majority of the employees. We believe that the record does not bear out the Board's conclusion that the Brotherhood did not have a majority on May 11 and that it did not have a free and uncoerced majority on May 17 at the time of the closed shop agreement.

The Board also found that three employees were discharged because of their activities in behalf of the United. Jefferson Electric contends that the discharges were non-discriminatory, temporary and simply due to lack of work. At the common law, the right of the employer to discharge was unconditional and absolute. Adair v. U. S., 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764; Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960; Cf. Texas & New Orleans Railroad Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034. Under the National Labor Relations Act the right to hire and to discharge remains inviolate, when exercised for ordinary ends. The employer may still discharge for good cause or no cause at all.

In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, the court said that it (the Act) "does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them"; that the employer "may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."

It would serve no useful purpose to lengthen this opinion by narrating all of the testimony bearing on this issue. We are satisfied, especially when considering the record in light of petitioner's course of conduct in respect to union activities and its dealings with its employees, that there is no evidence here that these men were discharged because of union activities.

The order is set aside, and the petition to enforce is dismissed.