## DIAMOND T MOTOR CAR CO. v. NATIONAL LABOR RELATIONS BOARD.
### No. 7495.

Circuit Court of Appeals, Seventh Circuit.

May 9, 1941.

James B. Wescott, Edward R. Adams, and Robert E. English, all of Chicago, Ill., for petitioner.

Robert B. Watts, Gen. Counsel, N. L. R. B., of Washington, D. C., and I. S. Dorfman, N. L. R. B., and Owsley Vose, both of Chicago, Ill., for respondent.

Before EVANS, and MAJOR, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

Upon charges preferred by International Union, United Automobile Workers of

America (hereinafter called United), the National Labor Relations Board (hereinafter called the Board) issued its complaint on October 11, 1938, against the Diamond T Motor Car Company (hereinafter called the Company), charging that the company had engaged in unfair labor practices affecting commerce within the meaning of Section 8 (1, 2, and 3) of the National Labor Relations Act, 49 Statute 449, 29 U.S.C.A. § 158 (1, 2, and 3). The decision below was favorable to respondent. The company filed its petition for review. The Board answered, requesting enforcement of its order. Jurisdiction is conceded.

The complaint charges, inter alia, that the company had engaged in unfair labor practices, had dominated and interfered with the formation and administration of the Automotive Workers Industrial Union (hereinafter called Industrial) and that the company had discriminatorily discharged and refused to reinstate one C. R. Cahill. The trial examiner who heard the evidence found that the company had not dominated or interfered with Industrial or discriminatorily discharged Cahill, but found that the Company had engaged in unfair labor practices within the meaning of Section 8(1). Upon review, the Board sustained the examiner with reference to employee Cahill and with reference to his finding of unfair labor practices, but overruled the examiner as to domination and found that the Company had dominated or interfered with the formation or administration of Industrial.

Pursuant to these findings the Board ordered the Company to cease and desist from (a) in any manner dominating or interfering with Industrial or any other labor organization of its employees and from contributing financial or other support thereto; (b) giving effect to an agreement between the Company and Industrial; (c) interfering with its employees in the exercise of any rights guaranteed to them by Section 7 of the Act, 29 U.S.C.A. § 157.

The Board further ordered the Company to take the following affirmative action: (a) Withdraw all recognition of Industrial as the representative of any of its employees; (b) post notices of compliance; (c) notify the regional director of compliance. Petitioner asserts that the decision of the Board is not supported by substantial evidence, nor by the facts found by the Board and that the inferences of fact drawn by the Board from evidentiary facts are unreasonable. Respondent asserts that its findings and order are amply supported by the evidence. The decision turns upon the company's relation with Industrial.

The facts, viewed in the light most favorable to the Board: In March, 1937, the Steel Workers Organizing Committee, affiliate of C. I. O., initiated a campaign among the Company's employees, looking to the ultimate organization of United. Shortly thereafter, C. A. Peirce who was Vice-president of the Company in charge of production, asked Frank Koci, a production employee if he had seen any C. I. O. cards passed around in the shop. Later, one Courval, a Superintendent, asked one Joseph Tishcovske, an employee, whether he knew anything about C. I. O. organizers having C. I. O. cards passed around the shop. Upon a negative reply by Tishcovske, Courval then said: "Joe, it's like this. Mr. Tilt the owner of this Company, will not stand for any Company union, outside union. * * * If Mr. Tilt finds out organization is going on here, I am going to lose my job; Mr. Peirce will lose his job, because Mr. Tilt will close this plant down * * *. He will have to move down to Georgia. That means all of the boys and you will be out of work." It does not appear that Tishcovske gave any heed to this or ever mentioned it until the hearing.

On March 24, 1937, a Chicago newspaper carried a news item to the effect that C. I. O. contemplated invading the company's plant with a campaign for unionization. Peirce soon thereafter summoned all of the employees to a meeting in the assembly room of the plant and addressed them at length. After stressing that an absence of strikes and the existence of friendly feelings had characterized the relations between the Company and the men in the past, he told the men that he did not want any strikes if he could help it. He told the employees that he had been reviewing the question of their pay and that they would receive a raise in pay the first of the following month and that he had under consideration the question of vacations. He then used the following language which the Board appears to have relied upon: "I hear there is a movement to organize our plant; I read it in the papers. * * * I have read the Wagner Act, and while I don't pose as any authority on it, I can say that you have a perfect right to or-

ganize in any way you see fit a union in our plant. * * * There are three forms of union that I know of. There is the Federation of Labor, there is the C. I. O. and there is an independent union form of organization and any of those are acceptable to me. However, personally, since I am going to conduct the negotiations probably with the representatives of whatever union is formed, naturally I would like to talk and deal with a man or men who know our business in our plant, understand our peculiar working conditions and can talk intelligently about them." Later, on cross-examination by the Board's attorney and in reviewing the foregoing incident he used this language: "If you are going to organize, I would prefer to deal with men who are working in a plant and know our business and our style of operation of a plant rather than someone from outside who doesn't understand it."

Peirce testified that fear in his mind that a strike was imminent was the reason which prompted him to call the meeting. He said his sole object was to preserve continuity of work in the plant. The President of United testified that Peirce told the men at the meeting that it was up to them to decide what they wanted to do, that it was their choice and that the responsibility was on them.

· Upon conclusion of Peirce's talk and at the request of the employees he left their presence and they were free to discuss matters of organization among themselves. A witness Schultz testified that later Peirce returned and suggested that the employees might take a vote to determine whether their organization would be an outside organization or one of their own. It is to be noted that this testimony was sharply disputed and the Board in its findings of fact recited: "Later in the afternoon the assembled employees decided to resolve the question by secret ballot. Cahill (an employee who favored C. I. O.) suggested that they vote either for the C. I. O. or for an inside union." The trial examiner stated in his report that the evidence was clear that after Peirce left, it became an open meeting for all employees with no supervisory agent present. Apparently the Board did not accept Schultz' statement in this respect. The vote was later taken, and the ballots deposited at the time clock as the employees left the plant for the day. Upon request of the employees and with Peirce's permission the votes were counted

in his office. The vote showed that a substantial majority favored the formation of what has been termed an "inside" organization.

Pursuant to the decision of the employees two men were chosen by the employees in each department for the purpose of forming such an organization. The day following the meeting referred to, some thirty representatives so chosen met during working hours in the shipping office of the plant and selected temporary officers. Thereafter, organizational meetings were held outside the plant almost nightly for several weeks. On April 18, 1937, the permanent organization of Industrial was effected, officers were elected and a constitution and by-laws adopted. Thereafter Industrial, through its representatives, entered upon negotiations with the Company concerning many phases of their relationship, but the principal controversy between the Company and Industrial appears to have been on the question of wages. An agreement was eventually reached and the officers of Industrial submitted it for ratification to the employees, at a meeting held at the plant on June 16, 1937. The Company had nothing to do with the calling of this meeting and Peirce did not know of it before it took place. The proposals were approved by the membership. Later, on December 9, 1937, a contract was entered into between the Company and Industrial, which remained in effect at the time of the Board's order. During some of the negotiations between Industrial and the Company, the Company permitted members of Industrial to meet on Company time and property, and for a brief time dues were collected from members in their departments and Industrial was permitted to erect bulletin boards in the plant.

Apparently the Company and its employees under the guidance of Industrial were proceeding harmoniously with little activity on the part of United until in April, 1938, when C. I. O. activity again developed. At that time Peirce in conversation with one Walter Stanisz, an employee, after inquiring about the labor situation, stated that he heard that there were C. I. O. cards floating around the shop and that some of the fellows were going to C. I. O. meetings. He said: "Why * * * don't you fellows seem to get along with Tom Law (Law was then President of Industrial) * * *? If you feel that you don't like Tom Law why don't

you get him out of there and get another man in his place?" On the same day Superintendent Courval also remarked to Stanisz: "I don't see why you attend these outside meetings." Later Courval is said to have inquired of employees if any of the employees had been talking about outside unions and meetings and had asked if Stanisz was a good worker.

In September, 1938, at a meeting with representatives of United, Peirce said: "Why did the boys switch from one outfit to another * * * why don't you fellows get on the side of the fence and play ball with us," adding that he did not see anything wrong with Tom Law.

It is not possible to here detail all the facts which are to be gleaned from an 800 page record. We have undertaken only to state in an abbreviated form those things principally relied upon by the Board.

The argument in support of the Board's finding of interference and domination, centers upon the speech by Peirce to the employees on March 24, 1937, and much stress is laid by the Board upon the language heretofore quoted from the Peirce speech.

To properly appraise what was said at that time by Mr. Peirce, it is pertinent to understand some of the background, as disclosed by the record. Peirce had been in charge of the Company for nearly twenty years, having previously taught engineering for five years at Cornell University. During his connection with the Company there had been no history of a Company union; there had been no labor disturbance of any kind or character and no strikes; the relation between employer and employees had always been cordial, pleasant and peaceful, and there had been no discrimination by the Company at any time on account of any union activities, by any employees. The Company which was in the business of assembling motor trucks, had previously been seriously handicapped and harassed by strikes and labor disturbances at plants of other concerns which supplied the Company with parts. There had been a period of sitdown strikes in the automotive industry that naturally was alarming to those employers who had previously maintained cordial relations with employees. When the news item came to Peirce's attention, indicating that persons outside the plant were about to interest themselves in the conduct of the affairs of the company and its employees he naturally

became alarmed for fear of a strike. In communication with Mr. Tilt, the president of the Company, the latter advised him to talk to the men about the situation and tell them that the company did not want a strike, that they had business and that a strike would be a serious matter. The circumstances indicate that the thought uppermost in Peirce's mind at the time of calling the employees together was to convey to them the feeling of the Company that they should by all means avoid a strike at the plant. Indeed, Peirce says that was his sole object. He pointed out to the employees that there had been no strikes during the twenty years of his association and that he would do anything possible to prevent one.

It must be borne in mind that the principal events relied upon all occurred in a single day—the newspaper item, the calling of the men together, the speech, and the subsequent meeting of the men and the preliminary steps of organization. Peirce told them: "I hear there is a movement to organize our plant * * * there are three forms of union that I know of. There is the Federation of Labor, there is the C. I. O. and there is an independent form of organization and any of those are acceptable to me. However, personally, since I am going to conduct the negotiations probably with the representatives of whatever union is formed, naturally I would like to talk and deal with a man or men who know our business in our plant and understand our peculiar working conditions and can talk intelligently about them. By all means don't let us stop work with any strike or any disturbance during these times when we have some business."

The Board urges that the language above quoted was indicative of Peirce's preference of an "inside" union over an "outside" union and amounted to coercion and restraint upon the employees in the free exercise of their rights to form a union of their own choosing. We think this language not reasonably susceptible to the narrow interpretation placed upon it by the Board. Measured by all the surrounding circumstances, other expressions in the speech and the background of the Company, we think it entitled to no such interpretation. It was natural for Peirce in working out any labor problems in the plant to prefer to deal with men who worked in the plant and knew and understood the business of the Company. To so express himself

is not to be condemned. Indeed, it is difficult to understand how the best interests of the men themselves could be fostered by one not working in the plant or not familiar with the operations of the Company. It seems to us that Peirce was saying to the men: "Form any organization you wish, but whether it be an independent organization, an A. F. of L., or a C. I. O., I would prefer that you give me someone to deal with who is familiar with your problems." This was just plain, common sense, not only from the standpoint of the Company but from the standpoint of the men and cannot by any stretch of the imagination be deemed to be coercive in character. Even if it be deemed an expression of a preference as between labor organizations, we still think, as we did in Jefferson Electric Company v. N. L. R. B., 7 Cir., 102 F.2d 949, and Foote Brothers Gear & Machine Corporation v. N. L. R. B., 7 Cir., 114 F.2d 611, that a mere showing of preference does not constitute unlawful interference with an employee in the exercise of his rights under the Act. It is only when such asserted preference, with all surrounding facts and circumstances, amounts to improper influence and approaches a coercive character that it is to be condemned. Any inference that undue pressure was placed upon the men by Peirce upon this occasion is not borne out by the conduct of the men themselves and by the testimony of those present. No witness called by the Board, to testify concerning Peirce's remarks gave any indication of pressure in his speech, but on the contrary their evidence indicates that Peirce told the men the problem was their own and that the responsibility was theirs.

Following the speech by Peirce, the men deliberated for some time, discussion was free, some favoring one form of union, some another. At the conclusion of the deliberations the vast majority favored the organization of the independent union, herein called "Industrial." Among those who spoke in favor of C. I. O. was Cahill, who later became president of Industrial. He remained president of Industrial until trouble arose within the union which led to his suspension by the union in August, 1937, and his later expulsion from membership. The board found that the company had no knowledge of either the suspension or expulsion of Cahill until sometime after it had taken place. If this be true surely it cannot be thought that the Company was then exercising any authority over Industrial.

Cahill, while he was president, in one of his calls for a meeting of Industrial distributed the following card: "Brother Members: In March of this year when an organization was first thought of it was the will of the majority that this be a real Union and not another racketeers' paradise. If you will stop to consider the progress we have made in the short time, you will see that it has taken plenty of hard work and loss of sleep. We as a body have gained items that could never be obtained as individuals. Shall we keep the ground we have gained or shall we let some of those among us who for a little personal gain would sell us back into the slaving underpaid conditions, that are sure to follow. Even now as in the past you have my entire time and thoughts to better conditions, all I ask is for your co-operation so we can carry out the original aim of this Union. I ask you as man to man to be present at the next regular meeting, August 10th, Lawndale Masonic Temple, 23rd and Millard Ave. Fraternally yours, C. R. Cahill." Forceful evidence of independent action by the men coming from one who formerly favored the so-called "outside" union.

The Board also stresses the statement of Superintendent Courval to employee Tishcovske wherein he is alleged to have said that Mr. Tilt would not stand for an outside union and that they would lose their jobs. This statement if made is not to be defended, but it should be considered in the light of its effect upon Tishcovske as it was made to him alone. Apparently it did not impress Tishcovske, for he did not see fit to mention it in his discussion or the employees' meeting following Peirce's speech. Tishcovske later joined United and there is no evidence that he ever mentioned the supposed remark until the hearing before the examiner. Moreover, Peirce was the man highest in authority at the plant and his subsequent declaration to the men, wherein he openly and frankly told them that the problem was their own and that they were free to join any organization of their own choosing in effect overrode and disavowed the previous expression of Courval.

We likewise believe that the occasional inquiries of Peirce and others with relation to the circulation of C. I. O. cards and

with reference to labor activities in the plant are overemphasized by the Board. It is to be noted that the trial examiner who heard the witnesses testify did not believe that the Company had interfered with or dominated Industrial. While this was not binding upon the Board in their consideration of the matter, it is strongly indicative of the character of the testimony.

We think the evidence, considered as a whole, falls short of being substantial proof of dominance or coercion or unfair labor practices. In giving recognition to that freedom of action guaranteed the employee by the statute, care must be taken that in preserving it for the one we do not by the same act deny it to another. The petition of the company for vacation of the Board's order is allowed and the petition of the Board for enforcement is denied.