NATIONAL LABOR RELATIONS BOARD v. CORNING GLASS WORKS et al.

No. 4711.

United States Court of Appeals First Circuit.

Heard April 8, 1953.

Decided May 21, 1953.

Thomas R. Haley, Seymour, Ind., Atty., N. L. R. B. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Frederick U. Reel, Atty., N. L.

R. B., Washington, D. C., on the brief), for petitioner.

W. D. Armour, Pittsburgh, Pa. (Nicholas Unkovic and Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for Corning Glass Works, respondent.

Joseph A. Robie, Donald W. Fisher and Mulholland, Robie & Hickey, Toledo, Ohio, for American Flint Glass Workers' Union of North America, intervening respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

The respondent is a large manufacturer of glass products having plants in several states including one in Central Falls, Rhode Island, where it employs approximately 860 workers. In May, 1951, the Federation of Glass, Ceramic & Silica Sand Workers of America, CIO, a labor organization which we shall refer to hereinafter simply as CIO, began to organize the respondent's Central Falls plant. Its campaign proceeded slowly, and for some unexplained reason it was at first conducted secretly, but nevertheless CIO's activity became known to the respondent's management by mid-June.

At about that time another labor organization, Flint Glass Workers' Union of North America, affiliated with the American Federation of Labor, and its Local Union No. 1007, referred to hereinafter collectively as AFL, also started to organize the plant. It opened its campaign with a letter dated June 11, 1951, from AFL's International President in Toledo, Ohio, to the respondent's Plant Manager in Central Falls advising the latter that AFL represented a majority of the production and maintenance workers at the Central Falls plant and insisting upon a meeting with the respondent's officers for the purpose of negotiating a collective bargaining contract. The Plant Manager acknowledged this letter on June 15, and said that the respondent would be available to meet at its plant with representatives of AFL on Monday, June 18 at 2 P.M. or on Tuesday, June 19 at 9 A.M., but gave warning that before the respondent would recognize AFL as the collective bargaining representative of its employees, AFL would have to prove that it actually represented a majority of the employees in an appropriate unit. AFL's International President by telegram selected the earlier date offered by the respondent, and agreed to present proof of majority representation at that time.

While this interchange of correspondence was taking place, AFL openly put on what can appropriately be called a whirlwind campaign for membership in the respondent's plant. Several rank-and-file workers, both men and women, with their supervisors' permission, left their machines to substitutes selected by their supervisors and circulated freely and openly throughout the plant on the respondent's time distributing AFL cards and soliciting membership in that Union from other workers both while the latter were at their machines as well as during their rest periods. And two or three of the respondent's supervisors verbally encouraged the solicitors in their work, inquired as to the progress of the campaign, and expressed satisfaction with the results being achieved, voicing preference for AFL over CIO, not only to the solicitors but also to other workers in the plant, saying in substance that it would be "advisable" to sign AFL cards, and that they did not want CIO in the plant.

On Monday, June 18, soon after the hour appointed,, representatives of AFL and of the respondent's management met for conference according to agreement. A joint committee was appointed to check the AFL cards turned in against the respondent's payroll, and while that committee was at work in another room, the rest of the conferees proceeded with discussion of a contract to take effect in the event of a showing that AFL represented a majority of the production and maintenance workers.

Previous collective bargaining agreements with both AFL and CIO covering respondent's employees at other plants were used as the basis for discussion. The most recent contract of the sort between respondent and AFL, covering employees at respondent's plant in Albion, Michigan, was

read and discussed paragraph by paragraph, and as the various clauses were agreed upon, in some instances with changes, the clauses were sent out of the conference room to be typed and mimeographed. The committee appointed to check union membership cards reported that of approximately 860 hourly paid workers on the payroll, 540 had signed membership cards in AFL, and at about 6:15 P.M. on the same day a contract consisting of some fifty-five mimeographed pages was signed. The conferees then went out to dinner together.

On October 19, 1951, General Counsel for the Board filed a complaint against respondent based on a charge made by CIO wherein he alleged that the respondent had violated § 8(a) (1) of the Labor Management Relations Act, 1947, 61 Stat. 136, by interfering with, restraining and coercing its employees in the exercise of rights guaranteed in § 7, and had also violated § 8(a) (2) of the Act in that it had assisted, dominated, contributed to the support and interfered with the administration of AFL. The usual proceedings followed upon the filing of the complaint.

At the opening of the hearing before the trial examiner all essential jurisdictional facts were stipulated, and then General Counsel's legal representative stated that he had no evidence to support the allegation that the respondent had dominated or interfered with the administration of AFL in violation of § 8(a) (2) of the Act. There being no evidence or finding that the respondent contributed financial support to AFL, the question boils down to whether or not the respondent violated § 8(a) (2) by contributing support other than financial to AFL, or violated § 8(a) (1) by interfering with, restraining or coercing its employees in the exercise of their rights under § 7, specifically by interfering with, restraining or coercing them in the exercise of their right to choose their union affiliation.

The trial examiner answered these questions in the negative. He first found that one of the individuals who had played an active role in AFL's organizational effort was not a supervisor, as General Counsel for the Board contended, but was only a rank-and-file employee so that his activities were not chargeable to the respondent. The trial examiner then found that although the respondent had given AFL wide latitude in organizing in the plant on the respondent's time, it would have given CIO like privileges if it had requested them, so there was no disparity in the treatment accorded the two unions, and hence the respondent had not assisted AFL in violation of § 8(a) (2). Furthermore, he found that while the respondent through some of its supervisors had expressed its preference for AFL and given encouragement to its activities, even to the extent of suggesting that on the basis of experience with CIO in another plant there would be more likelihood of strikes with consequent loss to the employees if that union got in, nevertheless the supervisors' expressions were privileged under § 8(c)[1] because they were not accompanied by any threats of reprisal or force or promises of benefit. Therefore he concluded that the respondent had not violated § 8(a) (1).

The Board disagreed with the trial examiner. It found that the employee referred to above as having been active on behalf of AFL was in fact a supervisor, so that his conduct was chargeable to the respondent. And it also found that the respondent, through its supervisors, including the above individual, had not maintained an attitude of "strict neutrality" while its employees were being simultaneously organized by competing labor organizations, which it said the statute required for the reason that any showing of favoritism for one competing union at such a time would defeat "the Congressional purpose of affording employees complete freedom in the selection of their bargain-

---

1. "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

ing representative." Following this, however, the Board went on to say:

"Under some circumstances expression of preference by supervisors may be privileged under Section 8(c) of the Act as may be simple expressions of preference by an Employer. In the context of the whole case, including the Employer's hasty recognition of the AFL, on a card showing with rival organizing going on, however, the activities of these supervisors obviously reflect Employer intent and action to aid one of two competing labor organizations, which is not protected by Section 8(c). We find that the statements of Hultzman, Tait, and Richard constituted more than mere expressions of opinion. Instead, we find that they amounted to verbal pressure upon the employees to join the AFL; as such, the statements of the supervisors can no more be disregarded than pressure exerted in other ways."

The Board's position is not altogether clear. First it says that "strict neutrality" is the rule for an employer to follow when rival unions are attempting to organize its employees. Then it backs away from this broad generalization by conceding that under some circumstances an employer may express a preference, but follows this up by finding that the respondent through some of its supervisors had overstepped the bounds and committed an unfair labor practice by indulging in "action to aid" AFL, which it apparently considered a violation of § 8(a) (2), and by exerting "verbal pressure" on its employees, which it obviously considered a violation of § 8(a) (1).

■ The action of the respondent relied upon by the Board to support its finding that the respondent had taken "action to aid" AFL, in violation of § 8(a) (2), is the respondent's hasty recognition of AFL on a card showing while CIO was attempting to organize the plant. Certainly such action standing alone does not constitute a violation of the Act. Employees are entitled under the Act to join any labor organization they wish, and a majority of the respondent's employees in the Central Falls plant having indicated their choice of AFL by signing its membership cards, the respondent was required to recognize that union and to bargain with it and to do so promptly. We concede that overhasty recognition of one union at a time when another is attempting to gain a foothold might under some circumstances amount to a contribution of support other than financial to the first union. But to constitute such support, we think there would have to be some nonprivileged discrimination against the second union, and there is no evidence of that in this case.

■ There is no evidence that the respondent had ever at any of its plants discriminated against CIO or its individual adherents, or given AFL or its individual adherents special organizational privileges. Instead it appears without contradiction that on previous occasions at the Central Falls plant the respondent had allowed both CIO and AFL unions the same organizational opportunities it afforded AFL in mid-June, 1951, and that it would have given CIO at that time and place the identical canvassing privileges it gave AFL, if CIO had asked for those privileges or had even attempted to exercise them. It is not the respondent's fault that CIO chose not to avail itself of the privileges given AFL, but instead chose to campaign in secret. Furthermore, there is nothing to show that after CIO's activities in the plant were known and its campaign came out into the open, the respondent's supervisors interfered with, molested, or in any way impeded CIO's solicitors in canvassing employees openly in the plant on the respondent's time. Thus there is no basis for finding that respondent accorded the rival unions disparate treatment in their contest for supremacy in the Central Falls plant in June, 1951, or even that it had ever at any time in the past at any of its plants discriminated against CIO by giving it fewer privileges than its rival. The most that can be found on the record is that the respondent gave AFL verbal encouragement and support which it denied CIO, and this we hold to be privileged under § 8(c) of the Act as will appear presently in our discussion of the § 8(a)

(1) violation to which we now turn our attention.

We do not know just what the Board meant by its finding that "verbal pressure" had been exerted on the employees concerned. But whatever the Board meant by the phrase, its finding of an unfair labor practice based on its finding of "verbal pressure" must be rejected.

 Section 8(a) (1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7", and among the rights guaranteed in § 7 is the right to join or assist labor organizations. There is no basis in the present record for finding that the respondent either restrained or coerced its employees in the exercise of the above right, as we shall point out presently in our consideration of § 8(c). Thus the most that could be found is that the respondent through oral expressions attributable to it interfered with its employees in their choice of a bargaining representative. But the First Amendment of the Constitution of the United States protects an employer with respect to the oral expression of his views on labor matters provided his expressions fall short of restraint or coercion, N. L. R. B. v. Virginia Electric & Power Co., 1941, 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348, and § 8(c) of the Act, supra, protects an employer with respect to like expressions in written, printed, graphic or visual form, provided his expressions contain "no threat of reprisal or force or promise of benefit."[2]

 Thus, if by "verbal pressure" the Board meant that the respondent's supervisors had by their words interfered with rank-and-file employees in choosing their union affiliation, the finding of an unfair labor practice under § 8(a) (1) cannot stand in the face of the First Amendment, or of § 8(c), supra, if it applies, unless the supervisors' expressions also contained

some threat of reprisal or force or promise of benefit. And, looking at the record as a whole under the rule of Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, there is no room for finding the latter.

The words used by the supervisors do not on their face contain any suggestion of revenge, coercion or reward, and no inference or threat of reprisal or force or promise of reward can be drawn from the bare fact standing alone that their expressions of views, argument or opinion are chargeable to the respondent, for to allow the drawing of such an inference would necessarily have the effect of rendering the protection afforded an employer by the First Amendment or by § 8(c) wholly illusory. Nor do the words used by the supervisors take on any hint or veiled suggestion of impending reprisal, force or benefit from the setting in which they were spoken. There is no evidence of a background of general union hostility on the part of the respondent. Neither, as we have already pointed out, is there any evidence of past or present discrimination against CIO or its members, or of interference with or molestation of its solicitors, or of special benefits given AFL or its members. Against such a background there is no room for a finding that the words used by the supervisors, though innocuous on the surface, were fraught with veiled threats of reprisal or force or promises of benefit. Cf. International Association of Machinists v. N. L. R. B., 1940, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F.2d 822, certiorari denied, 1950, 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595.

 Possibly, however, the Board meant by "verbal pressure" some interference by words falling short of expressions containing threats of reprisal or force or promises of benefit. But if it did, the Board's conclusion that the respondent violated § 8(a) (1) of the Act certainly can-

---

**2.** Section 8(c) does not expressly cover the expression of views, arguments or opinion in oral form, but we do not pause to discuss the significance of this omission, for if the section properly construed does not in fact embrace oral expressions within its scope, such expressions are afforded coextensive protection by the First Amendment of the Constitution of the United States.

not stand. The reason for this is that the First Amendment and § 8(c) clearly mark the limits of an employer's right to influence his employees, and certainly it is no part of the Board's function or ours to narrow those limits. If an employer keeps within the bounds fixed by the First Amendment and by Congress by stopping short of direct or indirect threats of reprisal or force, or promises of benefit, he cannot be found guilty of an unfair labor practice.

Nor can the Board's general proposition that "an employer must maintain strict neutrality when his employees are simultaneously being organized by two or more labor organizations" stand in all its breadth in the face of N. L. R. B. v. Virginia Electric & Power Co., supra, and § 8(c). An employer must give competing labor organizations equal organizational opportunities. N. L. R. B. v. Brown Co., 1 Cir., 1947, 160 F.2d 449. In that respect he must be strictly neutral, as the respondent was here. But the First Amendment and § 8(c) give an employer the right to express his views and opinions both orally and in other ways, and neither draws any distinction between the scope of an employer's right to express his views and opinions when his employees are considering whether to unionize or not and when they are deciding whether to join one union or another. The Constitution and the Act give an employer as much right to express his views in one situation as in the other, and again it is not for the Board or this Court to alter or curtail an employer's constitutional or statutory rights.

In substance, the most that appears in this case is that a few, at the most three out of approximately twenty-five, of the respondent's supervisors, for whose conduct the respondent is clearly chargeable, expressed a preference for AFL over CIO, even to the extent of encouraging rank-and-file employees to join the union they favored and disparaging the other. But there being no evidence of disparity in the organizational privileges accorded the rival unions, or that the words used by the supervisors contained direct, or in the setting in which they were used veiled, threats of reprisal or force, or promises of benefit, we conclude that the respondent's conduct is within the protection of the First Amendment, and also of § 8(c) of the Act, if the section without saying so in words covers expressions in oral form as was assumed below.

We pointed out earlier in this opinion that the trial examiner and the Board disagreed as to the status of an employee who had been particularly active on behalf of AFL—the trial examiner holding that he was a rank-and-file employee and the Board holding that he was a supervisor whose activities were therefore chargeable to the respondent. We see no occasion to resolve this conflict. If the individual was actually a supervisor, he was certainly on the bottom rung of the supervisory ladder, and his activities exceeded those of the admitted supervisors described earlier in this opinion only in that he handed a supply of AFL cards to a rank-and-file worker for distribution and, perhaps, was more outspoken in his advocacy of AFL and his disparagement of CIO. His act of handing cards to a worker, if attributable to the respondent, constituted such trivial support of AFL as not in our opinion to warrant charging the respondent with a violation of § 8(a) (2). See N. L. R. B. v. Brown Co., supra. And although his language amounted to strong expressions of preference for AFL over CIO, it did not, any more than the language of the admitted supervisors, amount, directly or covertly, to the expression of threats of reprisal or force, or promises of benefit. We therefore need not concern ourselves with whether he was actually a supervisor or not.

A decree will be entered dismissing the Board's petition.