**COPPUS ENGINEERING CORPO-RATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 5138.**

United States Court of Appeals First Circuit.

Heard Nov. 7, 1956.

Decided Jan. 16, 1957.

Ernest L. Anderson, Worcester, Mass., with whom Lloyd Anderson and Anderson, Anderson & Howard, Worcester, Mass., were on the brief, for petitioner.

Fannie M. Boyls, Atty., N. L. R. B., Washington, D. C., with whom Theophil C. Kammholz, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Margaret M. Farmer, Atty., N. L. R. B., Washington, D. C., were on the brief, for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The petitioner, Coppus Engineering Corporation, pursuant to § 10(f) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., hereafter called the Act, seeks review of an order of the National Labor Relations Board, and the Board has filed an answer to this petition and also a cross petition, under § 10(e), requesting enforcement of its order.

The Board ordered the petitioner to cease and desist from: assisting, dominating, contributing financial or other support to, or interfering with the administration of, the Shop Committee, or any other labor organization; otherwise interfering with the representation of its employees through a labor organization of their own choosing; recognizing the Shop Committee, or any successor thereto, as the representative of any of its employees for the purpose of dealing with the petitioner concerning terms or conditions of employment. Affirmatively, the order required petitioner to withdraw and withhold all recognition from, and completely disestablish, the Shop Committee, or any successor thereto, as the representative of any of its employees for the purpose of dealing with the petitioner concerning terms or conditions of employment. The Board in its decision and order adopted the findings, conclusions and recommendations of the trial examiner.

The conclusions of the trial examiner, so adopted, were that: (1) the Shop Committee was a labor organization within the meaning of § 2(5) of the Act; (2) the petitioner had engaged in unfair labor practices within the meaning of § 8(a) (2) by assisting, supporting, dominating and interfering with the administration of the Shop Committee; (3) by such conduct the petitioner had interfered with, restrained and coerced its employees in the exercise of rights guaranteed in § 7 and thereby had engaged in unfair labor practices within the meaning of § 8(a) (1); (4) that these unfair labor practices affected commerce within the meaning of § 2(6) and (7).

Since petitioner contests only conclusions (2) and (3) above, we need discuss only the facts pertinent to them. These facts as drawn chiefly from the findings of the trial examiner, and in the light most favorable to the Board, are as follows:

The petitioner, a Massachusetts corporation, is engaged at Worcester, Massachusetts, in the manufacture, sale and distribution of steam turbines, blowers, air filters and related products. It employs approximately eighty in its production and maintenance group.

On September 11, 1952, the United Steelworkers of America, C.I.O., filed with the Board a petition for certification as collective bargaining representative of the petitioner's production and maintenance employees. As the petitioner did not agree to recognize the Union as such representative, an election was held October 7, 1952 in which the Union failed to receive a majority.

Shortly thereafter, the petitioner's president, Jerome George, called a meeting of the production and maintenance employees at the plant. George made a short speech and suggested to the employees "that they have a permanent grievance committee, if that is what they wanted to call it, to handle grievances" with management. George then left the meeting and the employees nominated candidates to form a Shop Committee from among their number. A ballot was then drawn up and some days later an election was held at the plant. The five employees who received the largest number of votes constituted the original Shop Committee, hereinafter called the

Committee, with the employee receiving the largest vote serving as chairman.

Since its establishment the Committee entered into discussions with management concerning not only individual employee grievances, but also wages, hours, pensions, holidays and other working conditions.

In February 1954 the petitioner published at its own expense and distributed to all employees an eleven page booklet, with the cover containing the title, "Plant Rules and Policies," and the petitioner's name at the bottom. This booklet set forth the petitioner's rules and policies under six topic headings. The petitioner's name and address appeared again on the bottom of the last page. The first page contained the general heading "Plant Rules and Policies." Directly under that was listed the first topic heading, "The Shop Committee." The contents of this topic were the rules of the Committee.[1]

These rules were drafted by the Committee and approved by the employees at a meeting held at the plant. A witness testified that without the approval of all the employees the Committee voluntarily gave a copy of the rules to management, but he did not remember why they did so. A vice-president of the petitioner admitted that most of the matters contained in the booklet were discussed with the Committee and that some of the provisions set forth therein as petitioner's plant rules and policies resulted from meetings with the Committee.

The Committee at all times functioned in accordance with the provisions set forth in the booklet. Moreover, a copy of this booklet was given to every new employee hired by the petitioner.

Elections of Committee members were held twice a year at the plant during the lunch period, with the petitioner's knowledge. It can be concluded from the findings of the trial examiner that these elections were run solely by the employees without any member of management in attendance. Notices of the election results were posted by the Committee on the plant bulletin boards. The record shows that the employees were free to use the bulletin boards for any purpose. When the election meetings ran beyond the one half hour lunch period, the employees in attendance received their regular pay for such time. The trial examiner also found that whatever facilities and equipment involved in conducting the elections, such as ballots and the use of typewriters, were obtained at the plant.[2]

I. "1. The Shop Committee

"The Shop Committee is set up under the following rules:

"1. The Committee shall act as representatives of the employee and not as sole bargaining agents.

"2. The limitations of the powers vested in the committee shall be determined by the majority of the shop employees.

"3. In the event that a committee member is found guilty of negligence in the performance of his duties, he shall, by a majority vote of the employees, be asked to relinquish his position as a committee member.

"4. The initial or present committee shall serve for a period of one (1) year. Upon the expiration date of the one year period, two of the present committee members shall be retained for an additional period of six months. The remaining three (3) positions of the committee shall be voted upon for a one year period.

"5. The committee shall be subject to report to the shop employees all matters of discussion with the management, which pertains to the welfare of the shop employees, excepting that information which in the opinion of the committee, may prove to be detrimental to the efficient operation of said committee.

"6. In the event of employment termination, the unexpired term of a committee member shall be filled by the losing candidate who received the largest number of votes.

"7. The committee shall report to the employees on the very next scheduled working day following a meeting with management to convey to the employees any information regarding the progress being made in connection with tentative agreements to be reached upon by management and the employees.

"The Shop Committee will meet once a month at a regular time to be selected by management and committee."

2. The record only shows that some typing was done by "somebody upstairs in the

The Committee rules made no provisions for general employee meetings to canvass their grievances and to formulate their demands in common. Such meetings were usually held whenever the chairman told "the committee members that it was about time" for a meeting. A witness testified that meetings were called in this manner every two or three weeks. The employees were informed of such meetings by a notice typed by the Committee chairman and posted by him on the plant bulletin boards. These meetings, which no representative of management ever attended, were held in the petitioner's machine shop during the lunch period. At these meetings the employees brought up the subject matters which they would like to have the Committee discuss with management. The Committee then drew up an agenda which was submitted to the petitioner's vice-president. He then notified the Committee by a notice posted on the plant bulletin boards of the time set for a meeting with management. Meetings with management were held in the President's office during working hours and, as the trial examiner found, they frequently continued beyond the normal workday. The following day the Committee reported the results of its meeting with management at a meeting of the employees.

When employee meetings went beyond the regular lunch period, all employees in attendance continued to be paid their regular wages for that period. It was stipulated by the parties that some of these meetings ran from five to fifteen minutes over the regular lunch hour. The Committee members were paid their regular wages for time spent at management meetings during working hours and were paid time and a half for the period beyond the normal workday, when the total number of working hours for the week was above forty. A Committee member, who acted as secretary, typed the minutes of the employee meetings and of meetings with management, using plant facilities. The vice-president of petitioner also typed the minutes of the Committee meetings with management and furnished a copy to the Committee.

The Committee had no constitution or bylaws other than the Committee rules set forth above. There were no membership dues, no provisions or requirements for employee membership and no indicia of membership for the employees.

To this point the facts recited concern the background of the instant case. The sixth month statutory period, upon which the findings of unfair labor practices are based, commenced on April 21, 1955.

Since April 21, 1955 the trial examiner found that the Committee continued to exist and function in all respects in the same manner as described above until its suspension. Further, that the petitioner continued furnishing each new employee a copy of the booklet containing the rules of the Committee and the petitioner's plant rules and policies.

Elections, employee meetings, and management meetings were held at the plant. The employees in attendance were paid their regular wages when elections and meetings ran beyond the one half hour lunch period, and Committee members were paid for time spent at meetings with management when the meetings lasted beyond the normal workday. The Committee existed without any provisions for membership of the employees generally and without any source of revenue.

Since the beginning of the statutory period, on April 21, 1955, the Committee met with management approximately six times discussing a wide variety of terms or conditions of employment. The Committee, however, has not requested the petitioner to negotiate a written collective bargaining agreement.

office." It neither indicates where the paper used by the Committee came from, nor who did the typing. As to the source of the paper, one witness testified that it could have been scraps of paper that were used for ballots.

Upon charges filed by the United Steelworkers of America, AFL-CIO, the general counsel of the Board issued a complaint dated January 10, 1956. The complaint alleged, in substance, that petitioner engaged in unfair labor practices by dominating, assisting, contributing to the support of, and interfering with the administration of the Committee. After a hearing on January 31, 1956, the trial examiner issued an intermediate report and recommended order which was later adopted by the Board in its decision and order of May 21, 1956.

The question presented in these proceedings is whether substantial evidence on the record considered as a whole, as provided by § 10(e) of the Act, supports the Board's conclusions that petitioner committed unfair labor practices in violation of § 8(a) (2) and (1) and § 7.

Initially, we note that substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. Furthermore, it has been established that it is for the Board and not the courts to find the facts and to draw inferences from the evidence. National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed 831. Equally well established, however, is the principle that it is the responsibility of the reviewing court to determine "whether the Board's findings are supported by substantial evidence and whether its conclusions are reasonably inferable from the evidence." National Labor Relations Board v. Sun Shipbuilding & Dry Dock Co., 3 Cir., 1943, 135 F.2d 15, 25. Where the findings of the Board with respect to questions of fact are not supported by substantial evidence on the record considered as a whole the reviewing court has exclusive jurisdiction "to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board," as provided by § 10(f). Guided by these standards we believe the Board's findings [3] are not supported by substantial evidence.

We turn now to the first item of evidence, specifically, the circumstances surrounding the formation of the Committee,[4] upon which the Board relied for its findings. It appears in the record that in October 1952, shortly after the United Steelworkers of America lost the election at petitioner's plant, president George called a meeting of the employees and suggested "that they have a permanent grievance committee, if that is what they wanted to call it." George then left the meeting and the employees proceeded to form the Shop Committee. From this the Board inferred that "the proposal and impetus for the formation of the Shop Committee came from the [petitioner's] President George," and, further, that "inherent in the [petitioner's] suggestion was a promise to recognize and deal with the Shop Committee upon its formation."

We believe that the Board's inferences in this respect are without foundation in the evidence. It is clear that the finding of an unfair labor practice cannot stand in the face of the First Amendment or of § 8(c),[5] if the employ-

3. Although the only detailed findings were made by the trial examiner in his intermediate report, since they were adopted by the Board in its decision and order, they will be referred to as findings of the Board.

4. Although these circumstances, having occurred prior to April 21, 1955, the beginning of the six month statutory period, cannot be the basis of findings of unfair labor practices, the Board correctly concluded that they can be used as background shedding light on the character of the Committee and of the petitioner's conduct after April 21, 1955.

5. "Sec. 8. * * *
"(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit. * * *".

er's statement, upon which the finding is based, does not contain some threat of reprisal or force or promise of benefit. National Labor Relations Board v. Corning Glass Works, 1 Cir., 1953, 204 F.2d 422, 35 A.L.R.2d 408. Likewise, an employer's statement cannot be used as background material for the finding of an unfair labor practice where such statement falls short of restraint or coercion.

Looking at the record as a whole, there is no reason for concluding, as the Board seems to have, that George's statement gave rise to a labor organization which was the creature of management at inception, and which functioned in subservience to management after inception, contrary to § 8(a) (1) and (2).

If any meaning can be attributed to George's statement, it is that he preferred to deal with a permanent grievance committee as opposed to other types of labor organizations. The very fact that the employees formed the Shop Committee, an organization with much wider scope than a grievance committee, dealing with wages, hours, pensions, holidays and other working conditions as it did, shows how little the employees were influenced by George's statement. However, even if the statement be deemed an expression of a preference as between labor organizations by petitioner, it would not in itself constitute background material of unlawful interference with employees in the exercise of their rights under the Act. See Jefferson Electric Co. v. National Labor Relations Bd., 7 Cir., 1939, 102 F.2d 949. Only if "such asserted preference, with all surrounding facts and circumstances, amounts to improper influence and approaches a coercive character" is it to be condemned. Diamond T Motor Car Co. v. National Labor Relations Board, 7 Cir., 1941, 119 F.2d 978, 982. It is noteworthy in this connection that there was no evidence of a background of union hostility on the part of petitioner. Neither was there any testimony giving any indication that the employees acted under pressure emanating from George's statement. In con-

clusion, we believe that the Board, in making its findings, should not have placed the reliance that it did on George's statement.

The next item of evidence deals with petitioner's acceptance of the Committee as the representative of the employees without asking for proof of its representative status, although earlier it had forced the United Steelworkers of America to prove its majority status in an election. From this the Board concluded for the purpose of background evidence that "it can hardly be said that the Shop Committee was the freely chosen bargaining agent of the employees." We believe that in the circumstances here, especially in light of the fact the employees in a secret meeting had approved the Shop Committee as their representative organization by voting for members on the Committee, hasty recognition of the Committee did not amount to background evidence of support or domination by the petitioner. To constitute such evidence hasty recognition of one labor organization would have to be coupled with some nonprivileged discrimination against a rival labor organization, and there is no evidence of that in this case. See National Labor Relations Board v. Corning Glass Works, supra; Chicago Rawhide Mfg. Co. v. National Labor Relations Bd., 7 Cir., 1955, 221 F.2d 165. Petitioner, in forcing the United Steelworkers of America to an election, did not discriminate, but rather exercised a right given to it by the Act.

Another basis for the Board's findings that petitioner supported and dominated the Committee was the printing of the Committee's rules in petitioner's booklet of "Plant Rules and Policies," and the distributing of this booklet to its employees. The Board concluded as to this booklet that it created the inference in the minds of new employees that the "Shop Committee was and is a creature of the [petitioner]." We do not believe that there is any evidence of this in the record, for there is no testimony by any employee stating he was so misled. Moreover, it is clear

from the record that the Committee did not object to such printing by the petitioner. In fact, notwithstanding that the employees as a group did not vote on this action, it appears that the Committee voluntarily gave these rules to management. The printing and distribution of materials by an employer for a labor organization is not in itself a violation of the Act. Cf. Wayside Press, Inc., v. National Labor Relations Board, 9 Cir., 1953, 206 F.2d 862.

■ Next we turn to a review of the structure and governing rules of the Committee which the Board found to be further evidence of control and domination by petitioner. These rules, set forth in detail above, admittedly did not protect Committee members from petitioner's inherent power to discharge them, did not provide for a written agreement between petitioner and its employees and did not provide for general meetings of the employees or membership dues. We agree with the Board that without such provisions the Committee lacks the organizational strength and degree of independence which might be desirable. Nonetheless, the record clearly shows that these rules were drawn up solely by the employees. Furthermore, there is no actual evidence of domination of the Committee by petitioner. In view of the foregoing, we agree with the court in Chicago Rawhide Mfg. Co. v. National Labor Relations Bd., supra, 221 F.2d at page 170, where in a closely similar factual situation, it stated:

> "These acts do no more than evidence the presence of potential means for interference and support, a possibility that is always present to some degree in an employer-employee relationship. But, without evidence of the realization of that potential, they do not furnish a substantial factual basis for an unfair labor practice finding."

6. It was estimated by counsel for the respondent in oral argument before us that payment by petitioner to members of the

Without proof of actual domination, we believe the Board erred in basing its finding of employer domination on the *possible* inadequacy of the rules under which the Committee functioned.

The final portion of evidence upon which the Board relied is the payment by petitioner to the five members of the Committee for time spent on meetings with management, payment to the employees when their meetings with the Committee went beyond the lunch period, and use of plant property for Committee meetings with management and with the employees. Before proceeding further, it must be noted that support of this type, as the Board stated, has been regarded only as "an aspect of control." See National Labor Relations Board v. H. E. Fletcher Co., 1 Cir., 1939, 108 F. 2d 459. In the cases cited by respondent there existed, in addition to evidence of such support, other acceptable evidence of support and domination which is not true in this case.

Here, moreover, payments made to employees by petitioner in the above situations were of a minimal amount. For example, the record shows that Committee meetings with management were normally called at two o'clock and remained in session from fifteen minutes to two hours. The official quitting time being three-thirty o'clock, a greater portion of the payments made to the Committee members were permissible under § 8(a) (2).[6] As to payments made by petitioner to employees when their meetings went beyond the lunch hour, this too is not formidable evidence of support and domination. It appears by stipulation in the record that only "some" of these meetings ran from five to fifteen minutes over the regular lunch hour.

Finally, the use of petitioner's machine shop during the lunch hour for general employee meetings and the use of the president's office as the location of Committee meetings with manage-

Committee for meetings that went beyond the workday amounted to seventy-five cents.

ment round out the facts about which the Board concluded:

> "* * * In sum, the [petitioner] has made the functions of the Shop Committee possible by enabling them to take place on its property, with the use of such facilities as are needed, and by payments for time spent both during and after working hours. By such subsidies, the [petitioner] remains in a position to assure its domination over the Shop Committee."

We believe that the use of company property, and even time, for employee meetings, in the circumstances of this case, does not constitute substantial evidence on the record as a whole of support or domination. Chicago Rawhide Mfg. Co. v. National Labor Relations Bd., supra; National Labor Relations Board v. Valentine Sugars, 5 Cir., 1954, 211 F. 2d 317. This evidence shows no more than cooperation by petitioner and a possibility of company control. However, "neither mere cooperation, preference nor possibility of control constitute unfair labor practices; and the Board may not infer conduct that is violative of the Act from conduct that is not, unless there is a substantial basis, in fact or reason, for that inference." Chicago Rawhide Mfg. Co. v. National Labor Relations Bd., supra, 221 F.2d at page 168. The sections of the Act before us were "not enacted to prohibit or penalize courteous and friendly, or even generous, actions on the part of employers." National Labor Relations Board v. Valentine Sugars, supra, 211 F.2d at page 320.

The respondent cites many cases in support of the decision of the Board. But, as the Board stated in its conclusions, "no two cases [in this field] are altogether alike, and each must be judged by the totality of its own facts." Here, as opposed to many of the cases cited by respondent, the totality of the facts does not constitute substantial evidence of support or domination.

A decree will be entered setting aside the order of the Board.

MAGRUDER, Chief Judge (concurring).

The record contains no history of anti-union bias by this company. At an election conducted by the Board on October 7, 1952 (stated at the oral argument to have been a "consent election"), the United Steelworkers Union failed to win a certification by the Board as the bargaining representative of the employees in Coppus Engineering Corporation. This is the union which filed the charges in the instant proceeding.

It must not be forgotten that the employer, too, has a legitimate interest in having an established channel of communication between his employees and management, the only limitation being that the employer is forbidden to use his economic power in any way to fetter the free choice by his employees of their representative.

Therefore, after the employees had rejected the outside union at the election in October, 1952, it does not seem to me that the company was open to criticism when its president, later in that year, suggested to the men that they form a permanent committee with which the management might deal. This is quite apart from the fact that this suggestion was an event which occurred more than six months prior to the filing of the charges of unfair labor practices in the present case (see the proviso in § 10(b) of the Act).

No doubt, strong argument could be made that the resulting Shop Committee was an inherently weak bargaining representative, and a feeble instrument for conducting bitter economic warfare, as contrasted with a union affiliated with a strong national labor organization. But it may be that the employees at this particular plant did not feel the need of any different type of bargaining representative. The choice was theirs, and the Act guarantees to them freedom to exercise that choice, unimpeded by employer interference or coercion. If the employees should freely choose a different bargaining representative, there is no basis in the record for an inference

that the company would drag its feet in resistance to recognition of such a new bargaining representative, as the law requires. However, the statute does not make it the duty of the employer, nor a function of the Board, to "baby" along the employees in the direction of choosing an outside union as their bargaining representative.

In view of the inherent weakness of this Shop Committee as a bargaining representative of the men, perhaps it can truly be said that the management representatives hold the trump cards in any collective bargaining negotiations. But I do not think that the evidence as a whole warrants the inference that the company dominated or interfered with the formation or administration of the Shop Committee, within the meaning of § 8(a) (2) of the Act. Therefore, that part of the Board's order requiring the company to "disestablish" the Shop Committee, "or any successor thereto," as the recognized representative of its employees, certainly should not be enforced by this court.

But § 8(a) (2) also forbids an employer to throw his strength on to the scales by contributing "financial or other support" to any labor organization; and sometimes such a contribution of support, not amounting to "domination," may justify a Board remedial order in negative terms directing the company to cease and desist from the forbidden practice of furnishing such support. See, generally, The Carpenter Steel Co., 76 N.L.R.B. 670, 671–74 (1948).

However, in the present case the instances of "support" relied on border on the trivial; and I doubt whether the Board would have issued any order against the company had it realized that it could not go the whole way and order the disestablishment of the Shop Committee. On the principle of *"de minimis"* I am content that on the employer's petition we set aside the Board's order in its entirety, and that the Board's cross-petition for enforcement of its order be denied.