HARRISON SHEET STEEL CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 10419.

United States Court of Appeals Seventh Circuit.

Feb. 12, 1952.

---

1. Hebert v. Louisiana, 272 U.S. 312, 47 S.Ct. 103, 71 L.Ed. 270.

Irvin H. Weiss, Chicago, Ill., for petitioner.

George J. Bott, General Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Arnold Ordman, Henry Geller, Attorneys, National Labor Relations Board, all of Washington, D. C., for respondent.

Before KERNER, DUFFY, and LIND-LEY, Circuit Judges.

KERNER, Circuit Judge.

This petition brings before us an order of the National Labor Relations Board. Petitioner seeks reversal, and the Board prays for enforcement of the order. The petitioner has been found guilty of violating § 8(a)(1), (2) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1–3), by unlawfully supporting one of three competing unions, by discharging an employee for his activities in behalf of one of the two other unions, and by otherwise interfering with, restraining, and coercing its employees in the exercise of their rights under the Act. The order requires petitioner to cease and desist from the unfair labor practices found, to offer reinstatement with back pay to the discharged employee, and to disestablish the Employee Representative Plan in the event that it returns to active existence. Enforcement is resisted on the ground that the findings are not supported by substantial evidence.

Petitioner manufactures steel products. It has four plants in Cicero and Chicago, all of which are involved. Prior to 1949 it had a contract with UE[1] as the representative of its production and maintenance employees. Before the contract expired on

1. United Electrical, Radio and Machine Workers of America.

May 31, 1949, UE requested petitioner to enter into bargaining negotiations for a new contract. At the same time, the Teamsters,[2] who already represented petitioner's truck drivers, filed a petition with the Board seeking to be certified as representative of the production and maintenance employees. Pursuant thereto an election was held on June 1, with only the Teamsters on the ballot. The majority of the employees participating in the election voted against the Teamsters, and shortly thereafter UE again attempted to bargain with petitioner. During the month of June, 1949, UAW[3] began to organize petitioner's production and maintenance employees and demanded recognition by petitioner. Shortly thereafter petitioner was approached by its employees to set up a procedure to handle grievances until such time as another election could be held to determine a bargaining agent for the employees. Petitioner acquiesced, and about the middle of June allowed the employees to select two representatives from each of its plants (the Employee Representative Plan) to adjust grievances. An election machinery was set up by petitioner, and the Plan was explained to the employees by the superintendents of the plants at meetings in which the employees were urged to select representatives. The elections were held on company time and property, and the elected representatives thereafter met with petitioner's agents and discussed and adjusted grievances, bonuses, and other matters. During September, UE and UAW repeated their demands for recognition.

During September the Teamsters notified petitioner's agent, Sweeney, that unless petitioner agreed to meet with its representatives and negotiate a contract, it would be forced to strike. Sweeney replied that since there were two or three unions seeking recognition petitioner would not bargain with any of them until it was certified by the Board. Thereupon the Teamsters called a strike on September 27. Petitioner summoned the Plan representatives and informed them that unless petitioner

entered into an agreement with the Teamsters it would have to suspend operations. Sweeney proposed a poll of the employees on the question whether they preferred to have petitioner shut down the plant or have it recognize the Teamsters as the bargaining representative of the employees. Cain, petitioner's executive vice-president, was then called into the conference. He confirmed the position taken by Sweeney and sanctioned the election, and at the same time made it clear that regardless of the results of the election, petitioner would make its own final decision as to whether it would bargain with the Teamsters. At this meeting employee Todd asked that the employees be given a chance to vote for the Teamsters or UE or UAW, but Sweeney replied: "We told him that was not the question. The only permission we could give them was * * * whether or not the men wanted the company to recognize the teamsters for their members only, or whether or not they would rather have the plant shut down. There was no choice in the matter."

Cain delegated one Schneider, his assistant, to accompany the Plan representatives and help conduct the poll. The plant superintendents assembled the employees at separate plant meetings where Schneider and the Plan representatives addressed them. They were told that the choice was whether the Teamsters should be recognized or the plants closed down. The election was held. the employees being given blank pieces of paper on which they could write "yes" or "no." The vote was against recognition of the Teamsters, but petitioner wrote the Teamsters that it would recognize them "as the sole exclusive collective bargaining agency for all of its members" and posted on its bulletin boards notices to its employees stating that it had agreed to negotiate a contract with the Teamsters. The negotiations resulted in a contract effective as of November 1, 1949. In the recognition clause petitioner recognized the Teamsters as the bargaining agent only of the production and maintenance employees who were

2. Steel, Metal and Alloy Warehousemen and Handlers' Union, Local 785, of the International Brotherhood of Teamsters.

3. United Automobile, Aircraft and Agricultural Implement Workers of America.

members, but in succeeding clauses the contract provided that all employees who as of the effective date of the agreement had been employed not less than thirty days should become and remain members of the Teamsters in good standing, and that all newly hired employees, as a condition of their employment, should likewise become members on the thirty-first day of their employment.

Throughout this period petitioner made known to its employees its preference for the Teamsters. In April, Cain told Todd that he would like to have Todd assist the Teamsters in their organization campaign, and in September, Sweeney asked Todd, who had become UAW's organizer, to discontinue his activities for the UAW, and said "they [petitioner] could get rid of anybody they wanted to."

We see no need to recite here the evidence relating to the discharge of Charles Todd. It is correctly summarized in the intermediate report of the trial examiner, and the facts are set forth in the Board's decision at 94 N.L.R.B. No. 23.

It has repeatedly been held that an employer may not intrude in matters concerning the self-organization of his employees. He must refrain from all interference. He must maintain a strictly neutral attitude. Especially is this so where the adherence of the employees is being sought by rival labor organizations. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S. Ct. 615, 81 L.Ed. 893; Valley Mould & Iron Corp. v. National Labor Relations Board, 7 Cir., 116 F.2d 760; National Labor Relations Board v. Reynolds Wire Co., 7 Cir., 121 F.2d 627; National Labor Relations Board v. Burry Biscuit Corp., 7 Cir., 123 F.2d 540; National Labor Relations Board v. Sunbeam Electric Co., 7 Cir., 133 F.2d 856, 857; National Labor Relations Board v. Kropp Forge Co., 7 Cir., 178 F.2d 822, 825; National Labor Relations Board v. General Shoe Corp., 6 Cir., 192 F.2d 504, 507; and National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984.

In applying the principles enunciated in the cases cited we must remember that it is not our function to weigh conflicting testimony and pass upon the credibility of witnesses, and we may not reject inferences drawn by the Board from proven facts merely because different inferences might seem to us more reasonable. And we must observe the rule that the requirement for canvassing the whole record does not mean that we may displace the Board's choice between two fairly conflicting views, even though we might justifiably have made a different choice had we been the trier of the facts. Angwell Curtain Co. v. National Labor Relations Board, 7 Cir., 192 F.2d 899, 904. Now, with these rules in mind, after reviewing the entire record, we think there was sufficient evidence, considered as a whole, to abundantly establish that Todd was discharged because of his union activities; that the Employee Representative Plan was a company-dominated labor organization; and that by giving support and assistance to the Teamsters, petitioner interfered with, restrained and coerced its employees in the rights guaranteed by § 7 of the Act, and thus petitioner violated § 8 (a)(1), (2) and (3) of the Act.

Enforcement decreed.