**NATIONAL LABOR RELATIONS
BOARD**

v.

**VALENTINE SUGARS, Inc. et al.**

**No. 14662.**

United States Court of Appeals
Fifth Circuit.

March 5, 1954.

Rives, Circuit Judge, dissented.

**318**

David P. Findling, Associate Gen. Counsel, N.L.R.B., A. Norman Somers, Asst. Associate Gen. Counsel, N.L.R.B., Samuel M. Singer, Atty., N.L.R.B., George J. Bott, General Counsel, Morris A. Solomon, Attys., N.L.R.B., Washington, D. C., for petitioner.

Samuel Lang, John L. Toler (of Chaffe, McCall, Toler & Phillips), of Kullman & Lang, New Orleans, La., for respondents.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

HUTCHESON, Chief Judge.

This is a petition for enforcement of an order of the Board [1] which was based upon the conclusion that, in violation of Section 8(a)(2), 29 U.S.C.A. § 158(a)(2), the respondents had supported the Independent and interfered with its administration. This conclusion was in turn based on findings and the conclusion that, though the Independent was not company formed or company dominated, certain acts of respondents constituted lending it support; and that respondents interfered with the administration of the Independent through the action of one Hector Curole, a supervisor of respondents and a member of Independent, and gave it illegal support by their actions on May 14th in regard to the yet unratified contract with the Independent of April 30th at the Independent's meeting.

The respondents do not at all contest the factual truth of these findings except the findings that Curole was a supervisor and that by his membership in the Independent and their action on May 14th, respondents gave illegal support to the Independent or illegally interfered in its affairs. Indeed, they frankly admit that they did the things [2] that the Board found that they did.

They vigorously insist, though, that as matter of law, none of the things found, including Hector Curole's mem-

---

1. Requiring respondents to (1) cease and desist from (a) contributing support to Valentine Independent Union or any other labor organization; (b) recognizing or in any other manner dealing with the Valentine Independent Union as the collective bargaining representative of any of their employees unless and until it shall have been certified as such representative; (c) forming or giving effect to the bargaining agreement with it until it has been certified; (d) in any like or related manner interfering with, restraining, or coercing their employees in the exercise of the right of self organization, etc.; and (2) take the following affirmative action (a) withhold recognition from the Independent until it shall have been certified, and (b) post the attached notices. (102 N.L.R.B. 38).

2. (1) Permitting it and its Executive Board to hold meetings on the Respondents' premises and on company time:
   (2) Making the boarding house available for the Independent's suppers which were prepared by an employee of the Respondents:
   (3) Supplying the members of the Independent with transportation to and from such suppers;
   (4) On more than one occasion in effect paying the Independent's representatives for time spent in negotiating and executing its contracts with the Respondents by permitting the meetings to extend over into working time;
   (5) Providing the representatives of the Independent with the private automobile of one of Respondents' officers, paying for their meals and other incidental expenses, without loss of regular pay, for trips to the Board's regional office in New Orleans for the purpose of consulting the latter concerning its contract with the Respondents, the compliance status of the Independent and other Independent's problems; and
   (6) Assisting the Independent through Respondents' employees in the preparation of affidavits concerning compliance, the preparation of election ballots, the use of machines and other incidental types of assistance.

bership in the Independent if he was, as the Board found and as respondents denied, a supervisor, taken singly or together, constituted or could constitute furnishing support to the Independent or interfering with its administration, within the meaning of the invoked section.

They urge upon us that the language of the section makes this plain, that it is made even more plain when read in the light of the preamble of the original act and the amendment thereto, and that the legislative history of the original act and its amendment makes this construction mandatory. In short, respondents insist that what was done by it, as found by examiner and Board, was only the manifestation of the existence of that decent and kindly human relationship which should prevail between management and men, employees and their employer, and was not in any respect within either the language of the act or the mischief it was designed to meet and prevent.

They point in support of this contention to what was said in National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 263, 58 S.Ct. 571, 82 L.Ed. 831. There, dealing with the formation and domination of a company union, in violation of Section 8(a)(2), and the appropriate order of the Board to meet such a situation, the court, 303 U.S. at page 265, 58 S.Ct. at page 574, stated:

> "Hence, upon the challenge of the affirmative part of an order of the Board, we look to the Act itself, read in the light of its history, to ascertain its policy, and to the facts which the Board has found, to see whether they afford a basis for its judgment that the action ordered is an appropriate means of carrying out that policy."

Then, following an illuminating discussion of the Railway Labor Act of 1926,

45 U.S.C.A. § 151 et seq. and of the Railway Clerks case,[3] in which the court points out that the reports of the House Committee on Labor shows that it had before it the Railway Clerks case and that, in recommending the adoption of 10(c), 29 U.S.C.A. § 160(c), authorizing the Board to order the abandonment of unfair labor practices and to take affirmative action which would carry out the policy of the Act, the Committee had the decree in this case definitely in mind, the court went on to say:

> "In recommending the adoption of this latter provision the Senate Committee called attention to the decree which, in the Railway Clerks Case, had compelled the employer to 'disestablish its company union as representative of its employees.' "

We turn, then, to the opinion of the District Court in the Clerks case where the whole controversy was set out, and the reasons for the particular disposition of it were fully given. There the district judge pointed out that by the formation of the company union involved in that case, at the instance and with the assistance of the company, the respondent had gone about to put itself in a position to conduct sham bargaining by controlling both sides of the table, and, after stating the facts, said:

> "In short, upon a foundation laid in direct violation of the statute, they have sought to erect a superstructure of exclusive representation, and in the face of a statute and an injunction designed to secure the observance of the fundamental maxim, 'Audita alteram partem,' they have gone about to arrange it so that the railroad would be in a position of surely having a vote on both sides of the table, its own side and that of its employees.
>
> "* * * It appears that organizers of the Association of Clerical Employees have been sent out, on

---

3. Brotherhood of Railway and Steamship Clerks, etc., v. Texas & N. O. R. Co., D.C., 24 F.2d 426, 433, affirmed in Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034.

company time, and on company pay, and with company consent and approval, to organize the Association, while officers of the Brotherhood have been discharged from the service and excluded from wage conferences, members of the Brotherhood have had their pay docked for the time spent on its business, and other members have been dismissed from the service, * * *."

It must, of course, be conceded: that there were prevalent in some quarters [4] in 1935, when the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was passed, views that a class war, with employees on one side and employers on the other, was not only irrepressible but desirable, and that the proper, the normal relation and attitude of each to the other should be not one of mutual interest, interdependence and loyalty, but one of suspicion, distrust and even hatred. It must be conceded, too, that if the legislation in question was enacted under the influence of such views, every courteous and kindly gesture, every friendly and co-operative attitude, every considerate or generous act on the part of either toward the other ought to be regarded as hypocritical and deceitful, done with an ax to grind, and an overreaching purpose to deceive, and that the things found to have been done by the respondents in this case ought to be declared to have been done with the intent to subvert the rights of their employees in violation of the law.

The reports of the committees of Senate and House and the decision in the Greyhound Lines and the Clerks case, above quoted from, show, however, that the Congress, in enacting the Labor Relations Act, was not in sympathy with such views. The Act itself makes plain that it was not enacted to produce or encourage feelings or relations of hostility and enmity between employer and employee, but to assuage such feelings and change such relations. It makes plain, too, that it was enacted not to engender an atmosphere or climate of hate or ill will, or to prevent exchanges by employers and employees of courtesies and kindnesses essential to the maintenance of common human relations but to dispel such an atmosphere or climate and to encourage such exchanges.

Beginning with its preamble and continuing throughout its length, the act as a whole makes plain that its aim in part was to meet and prevent the mischiefs inherent in such views and to create and encourage contrary attitudes and relations, attitudes and relations appropriate, indeed necessary, for collective bargaining and the establishment and maintenance thereby of industrial efficiency and peace. The precise section in question here was not enacted to prohibit or penalize courteous and friendly, or even generous, actions on the part of employers. Its purpose was, and, if rightly interpreted and applied, its effect will be, to prevent what occurred and was properly condemned in the Clerks case. This was the giving by employers of lip service only, to the act by pretending to permit their employees to join or form an organization to represent them in collective bargaining, while the employers were actually forming the organization

4. Two books, published in 1933 by Covici-Friede, Publishers, "The Coming Struggle for Power", John Strachey, and a symposium of that way of thinking, gathered under the arresting title of "Recovery through Revolution", may be cited as illustrative of these views. In the last named, Calverton, one of the contributors, highlights his contribution to the symposium thus: "The American workers must learn to hate .* * *"

"Hate and not love is the emotion which they must nurture. * * * The gospel of love belongs to the ruling class; it is its best protection, for by its very preachment it tends to prevent the misery it spreads from volatilizing into violence. The gospel of hate belongs to the proletariat, for it is only by such hate that the energy necessary for its struggle can be engendered. More, it is only by virtue of that hate that a new social world can be created in which the gospel of love can have either place or meaning."

or taking it over themselves, with the result that they would have representation on both sides of the table, indeed would be dealing with themselves. In short, what the congress was striking at and intending to penalize was not the establishment and maintenance of friendly and cordial relations between employers and employees, but only the doing of the forbidden thing, trying by purchase or coercion to acquire for management a kept and dominated vote.

In further support of the view, that both the original Labor Relations Act and the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., amending it, were intended as positive legislation, whose end was amity and cooperation instead of strife and discord, we quote from the recent opinion of the Supreme Court, in N. L. R. B. v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U.S. 464, 74 S.Ct. 172, 176, affirming the finding of the Labor Board that the conduct of employees which was disloyal to their employers was "indefensible" and unlawful:

"* * * There is no more elemental cause for discharge of an employee than disloyalty to his employer. It is equally elemental that the Taft-Hartley Act seeks to strengthen, rather than to weaken, that cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise.

"Congress, while safeguarding, in § 7, the right of employees to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection,' did not weaken the underlying contractual bonds and loyalties of employer and employee. * * *"

If the proof had shown that the Independent was company formed, or company dominated, as the organizations condemned in the Clerks and Greyhound Cases were, and as they were in most if not all of the cases relied on by the Board, the Board's order in this case would be unexceptionable. The contrary, however, is the case. Under the undisputed facts, the examiner rejected the charges made in the complaint, that the Independent was company formed and company dominated. In addition, the evidence affirmatively established that over the many years in which the Independent had represented the employees against all counter efforts of the C. I. O. to represent them, it had been a really independent union which had given the employees adequate representation, and no complaint of it had ever been made. Also, it had been chosen by them in two elections despite the organizing efforts of the charging union in this case, and had been duly certified by the Board.

Further, it appears from the record [5] that, though the Independent has been the representative of the employees since 1946, no charges were filed against

<hr>

5. The record shows that in the first charge filed June 15, 1951, the union charged as the only unfair act the discharge of one Savoie. The second charge, filed Aug. 20, 1951, repeated the discharge of Savoie and charged that on or about and prior to May 1, 1951, the company had dominated, interfered with, and assisted in the formation of the Valentine Independent Union and at all times since said date has dominated, interfered with, and assisted in its operation and contributed support thereto. The third charge repeated the charge of domination and dropped the charge dealing with Savoie's discharge. The fourth charge repeated the charge of domination and

introduced a charge that one Saia was discriminatorily discharged.

It further shows that, on Jan. 11, 1952, the Board filed its complaint charging that respondents did on or about Jan. 22, 1946, form, sponsor and promote the Independent Union, and from Dec. 12, 1950, have assisted, dominated and supported it; that they executed a collective bargaining agreement with the Independent on April 30, 1951, at which time the Independent was being dominated, interfered with and assisted by them; and that the agreement was therefore invalid. The complaint further charged that respondents discharged Saia in violation of the act; that through their employees,

it until in 1951, after the union had lost the last election, and, that though serious charges of company formation and domination were made in the complaint, none of them were proved and all of them were rejected by examiner and Board.

Upon a full hearing on this complaint, it was established by undisputed evidence and in effect found by examiner and Board: that the Independent was organized in the early part of 1946; that its formation was not sponsored by the company, nor was there any domination then or afterwards of its affairs; that in a consent election held shortly after the formation of the Independent it was chosen as bargaining agent of the respondents' employees in competition with the C. I. O., a predecessor of the complaining union; and that the Independent was certified by the Board.

In February, 1947, the C. I. O. filed a petition for certification and election, but this petition was withdrawn presumably upon a showing that the Independent still represented a majority of the employees. In March, 1951, the C. I. O. attempted to organize the employees, a consent election was held on June 6, 1951, and again the employees chose the Independent. A protest was filed by the C. I. O. to the 1951 election. No action has been taken to date on this protest which it is significant to note did not include any charges of assistance, interference, or domination with respect to the Independent, though the complaining union knew all about the full facts. Finally when the charge was filed, it was based upon the claim in effect that the Independent was a company union, and not one of the matters made the basis of the findings and order was set out or charged either in the charge or in the complaint.

In the course of the hearing, the respondents proffered evidence to the effect that in other plants of similar companies located in the general area in which the C. I. O. was the bargaining representative of the employees, it was the practice to accord to the officers of, and to the C. I. O. union similar courtesies to those accorded here to the Independent and its officers, and though this evidence was objected to by the Board and, upon its objection, excluded, for the purpose of this opinion we must take it that the proffered evidence, if admitted, would have been to the effect of the proffer, thus showing that the practices complained of here were not strange and unusual but ordinary and usual.

Not a single case is cited by the Board, we have found none, where, all charges of employer domination having been rejected, the Board, upon facts of the nature of those established here, has found and held that by such acts alone an employer has unlawfully interfered with the administration or contributed to the support of a labor organization within the meaning, and in violation, of the act.

■ Conceding arguendo that there is sufficient evidence to show that of the eight members of the Independent charged with being supervisors, seven were not, and one of them, Curole, was, a supervisory employee in the technical sense that he has a position a little above the ordinary run of employees in skill at his work and pay received, it is quite plain on the record that he was not a supervisor in the sense of having managerial position or authority. All that the evidence shows as to him over and above his duties as an ordinary employee was that he was a skilled person in his line and that, because of his skill, he was sometimes called upon to show his help-

superintendents, etc., naming eight persons and including Curole, respondents interfered with, restrained and coerced their employees by (a) permitting their employees to campaign in favor of the Independent while censuring those who spoke in favor of the union; and that by these acts respondents have dominated and interfered with the formation and administration of the Independent and contributed substantial support to it.

ers and others how a particular piece of work should be done, and, in addition, he sometimes helped Mr. Barker, the manager, when called upon to do so.

This is not the kind of supervisor whose membership alone in a bargaining unit affords a basis for a finding of employer interference therewith or support thereof.

No objection was ever made to his membership in the Independent by anyone, none to his participation in the election, and there was no evidence that he did anything in a *supervisory capacity* to further the interest of the Independent or to thwart the organizing efforts of the C. I. O., and no charge or finding was based on any specific action of his.

■ Of the other matters found to be prohibited support, the only one that requires specific notice is an act of the officer of the company in lending his private car to Mulligan, an officer of Independent and three other employees including Saia, who the record shows was active for the C. I. O. in the election, to make a trip to New Orleans to consult the Regional Officer of the Labor Board and his letting Mulligan have Twenty Dollars to use for their expenses. If this incident had been coupled with evidence that demands were made upon, or concessions made by, the Independent as a result, or on the basis, of this act of helpfulness extended by the management, or that the Independent was allowed to electioneer in the plant, and the C. I. O. was not,[6] this evidence might have had probative force. In the state of the record, however, showing that no demands were made upon, or concessions made by, the Independent, these acts alone cannot fairly and justly support, a finding that the Independent was sup-

ported or its administration in any manner interfered with as prohibited by the act, or an order depriving the employees of their chosen representative.

■ As to the finding that supervisors of the company talked to the employees with reference to their approving a contract upon which the Independent and the company were in agreement, the evidence with regard to this shows that all that occurred was well within the limits of the free speech section of the act, and, more, that the representatives of the company not only did not in any manner attempt to control or even guide the employees in respect to their action on the contract but that they stated that if the contract was not fully acceptable to the employees, the respondents stood ready to confer and discuss with them any matters objected to and to do what it could to meet those objections.

■ The operations in question here were carried on in a rural area in a plant situated between two small country towns where facilities for meetings were difficult to obtain and where, except in an atmosphere of hatred and suspicion, the relations between employers and employees and the actions of the employer, upon which the finding of unlawful interference and support and the order under review were based, would be regarded as normal, indeed commendable. Because this is so, we think it is not in accord with common sense or reason to hold that it would be in compliance with or would carry out the purpose of the law to deprive the employees, whose rights, and not the rights of the contesting unions, the law was passed to protect, of their choice of representative, in favor of an organization which the employees have twice rejected and apparently do not want.[7]

6. The examiner found that this was not so, his finding being that C. I. O. activities were not circumscribed by respondents.

7. N. L. R. B. v. Flotill Products, Inc., 9 Cir., 180 F.2d 441; N. L. R. B. v.

Gaynor News Co., 2 Cir., 197 F.2d 719; N. L. R. B. v. Kingston Cake Co., 3 Cir., 206 F.2d 604; N. L. R. B. v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638.

The findings on which the order is based and the order find no support in the record. The petition to enforce it is
Denied.

RIVES, Circuit Judge (dissenting).

For reasons well expressed in the decision of the Board, 102 N.L.R.B. No. 38, I respectfully dissent. The things stated in footnote 2 to the majority opinion are not all that the Board found. It adopted also the findings of the trial examiner, including his finding that: "Mulligan and Becnel, as officers of the Independent, made several other trips on working time, and Mulligan made yet another with Barker to New Orleans, all without loss of pay." [1]

Some of the things that respondents did for the Independent might fairly be construed as mere kindnesses and courtesies and not to amount to "support" if they stood separately and alone. When, however, those things are considered all together, it seems to me that there was substantial evidence to justify the Board's conclusion. As said by the Supreme Court in National Labor Relations Board v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 60, 63 S.Ct. 905, 910, 87 L.Ed. 1250:

"Its conclusion is an inference of fact which may not be set aside upon judicial review because the courts would have drawn a different inference. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 270, 58 S.Ct. 571, 576, 82 L.Ed. 831; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 311, 84 L.Ed. 396."

Indeed to me, the conclusion reached by the Board appears to be reasonable and right.

The philosophy underlying the National Labor Relations Act was primarily a matter for the consideration of the Congress, and the business of the courts is simply to construe and apply the Act of the legislative body. Section 8(a) (2) is too clearly written, it seems to me, to admit of doubt in its construction:

"*Unfair labor practices*
"(a) It shall be an unfair labor practice for an employer—

\*　　\*　　\*　　\*　　\*　　\*

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;" 29 U.S.C.A. § 158 (a) (2).

The proviso makes plain what the Congress meant by the expression "contribute financial or other support to it." [2]

---

1. There is no contention that the evidence fails to sustain that finding. I quote only a part of the most pertinent testimony of Mr. Becnel, Secretary and Treasurer of the Independent Union:
 "Q. How far is Thibodaux from Valentine, from the Valentine plant? A. Twenty-five or twenty-six miles.
 "Q. Whose car did you go in when you went down there? A. I went in my car once.
 "Q. How about the other times? A. The other time, the last time I went in Mr. Mulligan's car and I think once we went in the company truck.
 "Trial Examiner Buchanan: You went three times?
 "The Witness: I think we made three trips. We went back to get the sample ballots and have a campaign letter written up for the Independent Union.
 "Q. (By Mr. Kyle) As I understand it, these trips were made during the work day and you didn't lose any time? A. I did not lose any time.
 "Q. By that I mean, you didn't loss any money out of your check? A. I was not docked. No."

2. This is, of course, an alternative provision and support of a labor organization alone, without domination, violates Section 8(a) (2). Harrison Sheet Steel Co. v. N. L. R. B., 7 Cir., 194 F.2d 407, 410; Wyman-Gordon Co. v. N. L. R. B., 7 Cir., 153 F.2d 480, 482; Reliance Mfg. Co. v. N. L. R. B., 7 Cir., 125 F.2d 311, 314.

When Congress considered the proviso necessary before an employer could even permit employees to confer with him during working hours without loss of time or pay, how can it be doubted that permitting the Independent's officers to take not one but four trips on company time without loss of pay, two of those trips in respondents' motor vehicles, and one of them with all expenses paid by respondents, amounted to contributing "financial or other support to it"?

The declared policy of the Act is to be effectuated "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C.A. § 151. The most direct and probably the most certain way to defeat that policy is for management to favor unduly, to "support", the representatives of labor. Under the Act, that is wrong. It is the same type of wrong that selfish interests sometimes commit when they bestow their favors upon legislators, or that an adversary might attempt by giving free trips to his opponent's attorney. Encouraging such practices is of no lasting help either to management or to labor, and certainly does not point the way to industrial peace and friendship. That other companies or labor unions may indulge in the same or similar practices, if that be a fact,[3] is no defense and makes the acts no less reprehensible. The employees are entitled to be represented by a union independent, not in name, but in fact, wholly uninfluenced by favors from management. In this respect, Congress has prescribed a strict standard of integrity, and that standard should not be loosened by the Court's construction. I, therefore, respectfully dissent.

**3.** The majority arrives at that conclusion through the consideration of evidence proferred but not received, a practice that seems to me totally indefensible.

See my dissent from the same majority in N. L. R. B. v. Southeastern Pipe Line Co., 5 Cir., 210 F.2d 643.