**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**THE SUMMERS FERTILIZER COMPANY, Inc., et al., Respondents.**

**No. 5253.**

United States Court of Appeals
First Circuit.

Heard Nov. 6, 1957.

Decided Jan. 14, 1958.

Robert J. Wilson, Atty., N.L.R.B., Washington, D. C., with whom Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gcn. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frederick U. Reel, Atty., N.L.R.B., Washington, D. C., were on the brief, for petitioner.

Herbert H. Bennett, Portland, Me., with whom Mayo S. Levenson, Portland, Me., was on the brief, for respondents.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

.HARTIGAN, Circuit Judge. ·

The petitioner, the National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., (hereafter called the Act), seeks enforcement of its order issued against the Summers Fertilizer Company, Inc. (hereafter called Summers) and Northern Chemical Industries, Inc. (hereafter called Northern). In essence the Board ordered Summers and Northern, which although different corporations had the same president and vice-president and a common office and until January 1, 1956 a common payroll, to cease recognizing the Summers Committee and Northern Committee respectively as the representatives of their employees for collective bargaining purposes, until such organizations were certified by the Board and to reinstate certain employees who had been discriminatorily discharged in violation of § 8(a) (3) and (1) of the Act. The Board found that Summers and Northern had assisted and contributed financial and other support to these Committees and had thus committed an unfair labor practice under § 8(a) (2) and (1) of the Act. The Board refused to adopt the finding of the trial examiner that Northern and Summers had unlawfully dominated the Committees and, therefore, did not order the Committees to be disestablished.

 It is necessary to examine the record as a whole to see whether there is substantial evidence therein to support this finding of unlawful support. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The Summers and Northern plants are located about five miles apart, in a rural area of Maine, the former being a fertilizer plant with about twelve employees and the latter is a manufacturer of chemicals employing about forty persons. In the summer of 1955 District 50, United Mine Workers, and the American Federation of Labor-Congress of Industrial Organizations attempted to organize the respondents' employees. On August 9, 1955 two representatives of District 50 met with the respondents' general manager and assistant general manager. One of these representatives testified that the other produced authorization cards signed by fifty-three of the respondents' employees but that respondents' officers refused to examine them. Colosi, the UMW representative, was then reported to have stated that as the Board would not certify the UMW because of its failure to file non-communist affidavits, it would be necessary to resort to economic pressure to obtain recognition and that he would wait until eight o'clock the following morning for the respondents' answer. Litty, the respondents' general manager, and Moynihan, the assistant general manager, then inquired of some of the Northern employees the next morning as to whether they would walk out unless Litty signed the UMW recognition statement. Two of the employees were reported to have said a vote would be necessary before a strike was called and the others were said to know nothing about it. In any event no walk-out occurred.

On August 11, 1955 a group of nine employees went from the Northern lunch room to Litty's office to determine whether Northern would recognize the UMW. A negative answer was received but Litty expressed a willingness to talk with the men if they could obtain recognition from a majority of the Northern employees as their bargaining representative. These nine men then returned to the Northern garage where the majority of the employees had met. It was decided that in order to present proof of recognition it would be necessary for all the employees to be at the meeting. It is undisputed that Moynihan was asked to come down to the garage with the payroll list of employees in order that all the employees could be notified to attend the meeting. The record is not clear as to whether it was Moynihan or a minor supervisor, for whose acts Northern was not responsible, who then instructed some Northern employees to notify absent employees to attend a meeting that afternoon to vote on a company union.

In any event the absent employees were notified to attend the meeting. At least one was under the impression it was a company meeting, and at least two of the absent employees testified they were paid by the company for their time when they came down to the garage to attend the meeting.

The Board found that all employees whether on or off duty, were paid for time spent in attending this and other meetings and the members of the Northern Committee executed an affidavit stating that one of their members had been instructed to notify the absent workers of the meeting and that they would receive pay for attending the meeting. At the afternoon meeting, thirty-six employees signed a paper agreeing to form "our own representatives bargaining committee appointed from the men of N.C.I." (Northern). The same nine men who had met with Litty earlier that day showed this document to him and he then executed a document recognizing the nine men as exclusive bargaining agents for all of the employees of Northern. Negotiations then began between Litty and the Committee which lasted until one o'clock the following morning and from eight o'clock the next morning until late in the afternoon when a memorandum of agreement was submitted by the Committee to the other employees for their approval. This memorandum was approved by a vote of thirty-four to six and a contract was signed by the Committee and by Litty on behalf of Northern later that night. This second meeting was also held in the Northern garage and the employees were paid for their time while at that meeting as were the members of the Committee for their time spent in negotiations. There does not appear to be any evidence that this contract was not the result of honest and determined bargaining by both sides.

On Tuesday, August 16, 1955, after the twelve employees at the Summers plant had heard of the contract and pay increases at Northern they decided to approach Moynihan, and inquire if they could also obtain pay increases. Summers employees testified that they had also decided that they wanted neither a contract nor a "company union" as had been created at the Northern plant. Moynihan then arranged a meeting between Litty and all twelve of the Summers employees at Litty's office at the Northern plant. At this meeting the twelve employees reiterated their request for pay raises without signing a contract. Litty replied that he would be glad to recognize the group and negotiate a contract. This did not satisfy the employees but after lunch four of the employees, who were apparently selected to represent all the Summers employees, met again with Litty who then handed each of them a statement recognizing them as a bargaining committee. This Committee and Litty also did not obtain any conclusive results as Litty insisted upon a contract which the Committee said it was not authorized to sign. On August 17th and 18th several of the Summers employees had discussions with Moynihan during the course of which Moynihan allegedly stated that if a contract was not signed, the plant would be closed down. It appears that the employees had been devoting most of their working hours to discussions concerning their situation and that Moynihan had instructed the foreman to allow the workers to continue their discussions on company time so long as they were talking about a contract. On August 11th a contract was signed by the Summers Committee after they obtained a concession from the company in the form of a provision relieving the Committee members of personal liability. The contract also contained a no strike clause as did the Northern contract.

On September 28th, all Summers employees went on strike and picketed the Northern plant seeking recognition for District 50. Several of the Northern employees refused to cross the picket line. On the following day the Summers employees were discharged for their violation of the no strike clause. The absent Northern employees were notified that

unless they returned to work by September 30th, they would also be discharged, and if any workers attempted to return after September 30th, the approval of both the company and the Northern Committee was necessary.

■ The principal evidence upon which the Board bases its finding that the respondents gave unlawful assistance and support to the Committees is that the companies paid wages to their employees for those periods of time during which these Committees were organized. In the case of the Northern Committee not only were the employees who were supposed to be working at the plant paid for the time they spent in organizing the Committee and approving the agreement reached by the Committee and Northern, but there was substantial evidence from which the Board could find that absent employees were also instructed to attend the organizational meeting for which time they would be paid at their regular rates. While from some points of view it may be laudable for the respondent to pay its employees for this time, there is no doubt that this constituted financial support of the Northern Committee. It is true that occasional use of company property or the payment by the company for minimal periods of employee time spent in organizational purposes may not per se constitute illegal support. Coppus Engineering Corp. v. National Labor Rel. Bd., 1 Cir., 1957, 240 F.2d 564, National Labor Relations Board v. Valentine Sugars, 5 Cir., 1954, 211 F.2d 317. But if there are other facts from which the Board may infer that such use of company property or payment of wages frustrated the purposes of the Act in that employees were denied the right to freely choose, without regard to the desires of their employer, their representatives for collective bargaining then such support constitutes an unfair labor practice. National Labor Relations Board v. Wemyss, 9 Cir., 1954, 212 F.2d 465. In Coppus Engineering Corp. v. National Labor Rel. Bd., supra, a consent election had

been held in which the complainant union failed to receive a majority vote. It was only after this election that the Shop Committee was formed. Similarly in National Labor Relations Board v. Valentine Sugars, supra, two consent elections had been held in both of which the independent union was selected by the majority of employees over the complainant union. In the instant case, however, no such election was held despite much evidence tending to prove that respondents' employees may well have selected District 50 as their representative if such election had been held. In fact, a witness first called by the Board but later declared to be an adverse witness, in response to a question by respondents' attorney as to whether the employees wanted to be represented by the United Mine Workers, stated that they would have wanted to be represented by the UMW if Northern had "accepted" the UMW representatives.

■ It cannot be denied that employees have a right to choose either an independent unaffiliated union composed solely of fellow employees or a union affiliated with a national or international organization, but where such choice occurs after the initiation of organizational drives by other unions and after the demand for recognition by one of these unions, any form of benefit contributed by the employer to a particular union must be closely examined. See National Labor Relations Board v. Brown Paper M. Co., 5 Cir., 1940, 108 F.2d 867, certiorari denied 310 U.S. 651, 60 S.Ct. 1104, 84 L.Ed. 1416. The test to be applied is whether such benefit is allowable cooperation with the freely chosen representative of the employees or is it in fact an inducement to these employees to choose an organization, which without this support, would very likely not have been so chosen. In the instant case the Northern Committee was given support through the use of company property, the assistance of Moynihan in calling in absentee workers, and especially the payment by the company for the employees'

time spent in organizing the Northern Committee.

The evidence in the Summers case is even more strongly in support of the Board's decision for the Summers employees could reasonably be found to have been induced to authorize this Committee to act as their bargaining representative by the unusual behavior of Summers in allowing its employees to hold discussions among themselves for two days with pay. It also could be reasonably concluded that Moynihan's statement concerning the closing down of the plant unless an agreement was reached influenced the employees to give up their initial reluctance to the formation of an independent bargaining representative with authority to sign a contract. The authorization of the Summers Committee was the likely result of the allowance of these discussions on company time and property coupled with this prodding by management representatives to reach an agreement.

As we conclude that the Board's finding that the Northern and Summers Committees were aided by the unfair labor practice of the respondents is based on substantial evidence, it follows that the discharges of those employees who went on strike in order to obtain recognition of another union was not protected by the no strike clauses in the contracts entered into by the illegally supported Committees. These discharges thus violated § 8(a) (3) of the Act and the Board's ordering of the reinstatement of the discharged employees was correct.

The respondents also contend that the findings made by the Trial Examiner were the result of bias and prejudice on his part. However, when the record is viewed as a whole, we are not persuaded that the respondents were not afforded a fair hearing. See National Labor Relations Board v. Bryan Mfg. Co., 7 Cir., 1952, 196 F.2d 477.

A decree will be entered enforcing the order of the Board.